**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ARKANSAS RICE GROWERS COOPER-ATIVE ASSOCIATION, Respondent.**

**No. 19088.**

United States Court of Appeals.

Eighth Circuit.

Aug. 23, 1968.

Jerome Weinstein, Atty., N.L.R.B., Washington, D. C., for petitioner; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Janet Kohn, Atty., N.L.R.B., on the brief.

B. S. Clark, of Smith, Williams, Friday & Bowen, Little Rock, Ark., for respondent.

Before MATTHES, GIBSON and LAY, Circuit Judges.

LAY, Circuit Judge.

The Board seeks enforcement of its order for collective bargaining, finding the Company, Arkansas Rice Growers Association, failed to bargain in good faith with the Union[1] in violation of §§ 8(a) (5) and (1) of the National Labor Relations Act, as amended. The Board bases its finding (1) on the Company's unreasonable refusal and delay in providing wage and payroll data to the Union and (2) on the Company's lack of good faith as required by § 8(d) of the Act when bargaining with the Union. It is undisputed that the Union was the certified bargaining representative of the employees at two Company plants.

This court has carefully reviewed the record, the contentions of both the Board and the Company, and we conclude that there was substantial evidence warranting the Examiner's findings and conclusions, fully adopted by the Board. We grant enforcement.

The Respondent claims the Board bases its case upon the Company's refusal to concede or acquiesce in the Union's proposals. Our analysis confirms, however, the Board's appraisal to be based upon evidence of absence of good faith negotiation and is not related to a refusal to agree upon a contract.

The Examiner relates his findings to three general areas of the negotiation: (1) the Company's refusal and delay in

[1]. The Union is International Union of United Brewery, Flour, Cereal, Soft Drink and Distillery Workers of America, AFL–CIO.

furnishing to the Union data relating to rate of pay, wages and related matters concerning its employees; (2) the Company's refusal to negotiate in good faith with the Union concerning the in-plant collection of Union dues; and (3) the Company's bargaining with the Union in bad faith with no intention of entering into any final or binding agreement.

## (1) REFUSAL AND DELAY TO FURNISH DATA.

The evidence clearly shows the Union's repeated demands over a period of four months for various data relating to job classifications and wages of the employees. At the time of the requests there was no dispute as to its relevance. It is true that the Union's requests were made more definitive in successive demands, but their request for basic information could never have been in doubt. The Company's refusals varied: (a) on April 29, 1966, Respondent's attorney, Mr. Clark, refused to provide the requested information on the ground that it was "confidential"; (b) on May 29, 1966, Mr. Clark raised doubt as to the Union's certification [2] and further declined to furnish any remaining information (partial but incomplete data had been furnished after the Union's first request) because of "what just occurred at Carlisle, Arkansas"; [3] (c) on June 24, 1966, Mr. Guffin, Respondent's personnel manager, again refused to furnish the information requested and reaffirmed that the reason for the refusal was that it was "confidential"; (d) Respondent's brief says the information was additionally delayed because it had to be prepared. This fact was never used as a basis of denial in the Company's letters to the Union. The Company finally produced the data in August.

Alleged confidentiality of relevant economic data needed for informed bargaining is no defense. NLRB v. Frontier Homes Corp., 371 F.2d 974 (8 Cir. 1967).

The testimony of the Company's attorney at the hearing indicates the Company's "presence of mind" as to the genuineness of their reasons given in refusing to produce the data:

"Q. Why did you furnish it on August the 11th? A. This was discussed by the committee and by management and we knew that the annual review was coming up, and we discussed our overall position; and it had been some time since the incident at Hazen occurred; the company was still concerned about what would happen to this information if it were furnished Mr. Gerchak. Would he use it as it was intended, or would he use it for propaganda purposes.

"Now I advised the company that sufficient time, in my opinion, had passed since the incident in Hazen; that we had discussed it with Mr. Gerchak on at least two or three occasions and he denied any responsibility for it; and we had no alternative but to go ahead and furnish this information *because the law required that we furnish it.*" (Emphasis ours.)

The information was material and the Company's refusal to produce it upon request may be considered with all the other facts and circumstances to determine a violation under § 8(a) (5). NLRB v. Acme Indus. Co., 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); NLRB v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). The Union's ultimate abandonment of its wage raise does not negate its relevance

---

**2.** This contention, at the time was completely unfounded.

**3.** As explained in n. 4 of the Examiner's opinion:
"Hubert Hatfield, manager of Respondent's plant located at Hazen, Arkansas, testified that during May an unknown person left on a desk at the plant copies of the classification information which the Respondent had supplied to the Union. In the above letter Clark mistakenly referred to Carlisle. Gerchak admitted that he had had about 200 copies of this information reproduced and that he had distributed them to employees at a union meeting. He denied having anything to do with leaving copies at Hazen."

at the time the information was requested.

### (2) COLLECTION OF CHECK-OFF DUES.

The Examiner found that the Company had refused the Union's proposal of any collection of in-plant check-off dues through Company collection or by use of Union personnel "on or off work times," as it did not want its employees "bothered while working." Respondent based the Company's refusal to deduct the dues from the employees' checks on the excessive cost of changing its IBM machinery (between $30,000 to $50,000) to include check-off dues. According to the Union representative, Mr. Gerchak, the Union counter proposed in-plant collection by Union personnel of dues during non-working hours in non-working places. According to Mr. Gerchak, this at all times was rejected by the Company without any counter offer or proposal. The Union representative testified that throughout all negotiations the Company refused in-plant collections of *any kind* "as a matter of principle." [4]

Mr. Clark testified:

"And I want to state that our position was, and still is, that we have no objection to an employee in the plant collecting union dues on his own time on company premises.

"I think our position on that is rather obvious because the law prohibits us in this respect, and we certainly would not stand in the way. *And as Mr. Guffin said, if there is something that could be worked out,* and this was discussed about making an outside the area there, if they wanted it to be at a certain place at a certain time as long as it did not create any traffic problem or cause employees to congregate at a particular exit, we certainly have no objection to that.

"But our position has been that we denied the union's check-off suggestions and we discussed with them the possibilities of alternatives.

\* \* \* \* \* \*

"Q. Was this made as a proposal to the union? A. No, we never made it as a proposal, but we stated it as a position.

\* \* \* \* \* \*

"Q. But you never did make this as—after the union made their proposal and counter-proposal—you never did make a proposal? A. No, we never made a proposal to the union that an outside representative could come in and collect union dues in the plant. No, sir, we have not." (Emphasis ours.)

The above testimony as to the Company's willingness to work things out was in December 1966. The Union first proposed in-plant collections by union representatives as early as April 20, 1966.[5]

■■ The Company is not guilty of *per se* violation of § 8(a) (5) in refusing to make a counter-proposal. Nevertheless, the Examiner when weighing all the circumstances, particularly in light of the Union's ultimate abandonment of any proposal to have in-plant collections, may reasonably credit the Union's version as to the Company's total obstruction to reach agreement in this area. Cf. United Steelworkers of America, AFL-CIO v. NLRB, 124 U.S.App.D.C. 143, 363 F.2d 272 (1966).

### (3) ABSENCE OF GOOD FAITH NEGOTIATION.

After many prolonged meetings (the first occurring on March 30, 1966) and repeated rejections of the Union's proposals, the Union on August 11, 1966, abandoned its proposals relating to wage

4. Evidence was received to show that the Company permitted in-plant collections of insurance premiums.

5. The record shows there was much "sparring" as to who in the Union was to do this collecting. However, the Examiner found that Mr. Guffin, the Company personnel manager, and Gerchak both agreed as to the Union's version, and rejected Clark's disagreement. The details of this testimony do not aid the Company in its defense here and need not be discussed.

increases, grievance procedure and in-plant collection of dues. The Union accepted the Company's "proposals" in order to negotiate a contract.[6] The Company representatives admitted their "surprise" to the Union's abandonment of its proposals. The Union representative said the Company officials were "flabbergasted."

The evidence reflects that Mr. Gerchak, the Union representative, testified that Mr. Clark, at the August 11 meeting, upon hearing the Union's abandonment of its "proposals" and acceptance of the Company's "proposals" said he had "second thoughts" on some of his "proposals" and "might want to change them now" and then Clark mentioned that all of the Company's "proposals" were on a "five year basis." [7]

The Company upon reflection, on September 22, 1966, again rejected the Union's proposal for several reasons, many of which were revealed in the negotiations for the first time. We need mention only some of the more salient ones: (1) the Company claimed that none of the statements made by them in prior negotiations had been intended to be "proposals"; (2) the Company still did not agree to a one year contract, but wanted a five year contract; (3) the Company objected that the grievance procedure would apply to its annual wage review; and (4) the Company felt its own proposed "management rights clause" was unfair to the Union and not properly understood by its members.

Mr. Clark, who serves as Respondent's counsel on this appeal, who was Respondent's attorney and key witness at the hearing and who acted as Respondent's negotiator in dealings with the Union, testified:

"Q. And you wanted a five year contract, or suggested a five year contract? A. We *suggested* a five year contract. We did not say we *wanted* a five year contract.

"Q. So in fact it would be a five year contract with wages completely at the discretion of management? A. No, Mr. Jermain. This is bargaining. When you suggest something in contract negotiations, you don't have any idea whether the union is going to take it or not. In negotiations you leave yourself room where you can move in another direction; some common ground; some little ground in between. And as I say, and as Mr. Mason explained, at one of our sessions, we have reasons for wanting a contract longer than one year. I don't know whether the union got this message or not, or whether they've ever gotten it, *but I'm not saying here today, or telling anyone that we would have signed a five year agreement.* That's the reason we didn't make it in the form—

"Q. (Interposing) Well Mr. Clark, during contract negotiations you make a statement, you mean what you say, do you not? A. *In contract negotiations you don't always mean exactly what you say, no, sir.* You can make a suggestion—well, I'll say this. Whenever you make a firm proposal, you'd better mean that, Mr. Jermain, because when they accept it you've had a meeting of the minds.

"Q. You mean that a suggestion of a five year contract is not a firm proposal? A. No, sir, it was not a firm proposal.

"Q. It was just a mere suggestion? A. Yes, sir." (Emphasis ours.)

One of the reasons for rejection of the Union's acceptance of the Company's "proposals" as of September 22 was that the Union, although accepting the Company's "suggestion" of annual wage review, still insisted upon submitting the review to grievance procedure. However,

---

6. The Union's acceptance was based on a one-year contract whereas the Company had always requested a five-year term.

7. On September 22, 1966, Mr. Clark, in again rejecting the Union's proposals, said however, "whether the expiration date [of the contract]" was "one year, two years or three years" it should come on February 1 so as not to occur in the harvest season.

the record shows that the Union representative, Mr. Gerchak, stated at the August 11 meeting that the Union was willing to abandon its proposal to have the wage review subject to grievance procedure. Mr. Guffin, the Company's representative, in substance verified Gerchak's testimony. When Mr. Clark was asked about the Company's rejection on this ground, the record shows:

"Q. Didn't they [the Union] at that session, orally waive making the annual review subject to the grievance procedure? A. *No. Mr. Guffin was asked that question and he said yes, and I say no. Or rather I say I don't remember if they did.*

"Q. You don't recall? A. I don't recall. *Now if Mr. Guffin says they did, all right.* But I don't recall it because I know I certainly didn't consider the proposal they made was free of grievance."

Yet Mr. Gerchak had clearly announced the Union's abandonment at the August 11 meeting. It is difficult to perceive why as of August 11 or as late as September 22 there was no further attempt made to reach an agreement in an area where proper negotiation would have made clear that no real disagreement existed between the parties. Yet Clark's only response on behalf of the Company was again that of outright rejection.

Then Mr. Clark testified as to why he rejected the Union's acceptance of his own proposed "management rights" clause:

"Q. (By Mr. Jermain) Mr. Clark, you stated that on September 22nd you explained to the committee that the management rights clause was all inclusive? A. Yes, sir.

* * * * * *

"And this management rights clause had been offered; it had never been discussed in any detail other than at one time Mr. Gerchak said it stinks and he wouldn't even wrap a fish in it. That might have been a very good explanation at that time.

"* * * And I was concerned about whether they really understood the rights of management under that management rights clause because certainly, in making our initial proposal, *we had drafted it to our advantage thinking certainly we would have a counter-offer on it and somewhere we could meet in between.*

* * * * * *

"Q. (By Mr. Jermain) So you personally didn't think too much of this management rights clause in regard to the union, I trust? A. *Well, I think a lot of it as far as the company's interest is concerned, but it certainly doesn't operate too much to the advantage of the employees.*

"The committee is convinced, and we have discussed this, that we want a contract that is livable. By that I mean, that both parties can operate under. And we want one that when we finally put our signature to it everybody understands it because we're going to follow it to the letter. We have told them that and it has been my experience that this is the best type of contract and it serves the best interest of most of the employees and the employer.

* * * * * *

"Q. And the committee and Mr. Gerchak had these proposals, company proposals, in their possession from April 2nd until August 11th, is that correct? A. Had the company proposals in their possession?

"Q. Yes. A. From April 6th until August 11th, right.

"Q. And that's a considerable length of time to study proposals and to examine those proposals, isn't it? A. I'd say that would be more than adequate time for a union to understand the proposals, yes, sir.

"Q. Well, wouldn't your comments tend to undermine, or were they designed to undermine Mr. Gerchak's position with his own committee? A. Of course that calls for a conclusion, Mr. Jermain, but I don't think they

were. Certainly it was not my intention to—my intention was merely, since we were approaching the point where a contract was going to be signed, I wanted to make certain that everyone understood the language and the effect of it. *And we weren't going to be rushed into signing something that we weren't satisfied with and I didn't think that the union should do the same.*

"Now I wasn't trying to run their business for them or anything of that nature, but we wanted to have a workable agreement.

\*　\*　\*　\*　\*　\*

"Q. You had carefully considered this proposal before you submitted it, had you not? A. Yes, sir.

"Q. And it was a firm proposal from the company? A. Yes, sir.

"Q. Did you make any counters, or subsequent proposals? A. On what?

"Q. Since you seemingly felt that this was too strong or very advantageous to management—

"Trial Examiner: Do you mean on or after August the 11th?

"Q. At any time? A. *No, sir, but I certainly left the door open for them if they wanted to suggest any changes to it.*

"Q. *They had already agreed to it though, hadn't they? A. Yeah, they had. I was surprised they did.*" (Emphasis ours.)

 We are confronted with a record which reflects that the only acknowledged "firm" proposal the Company offered the Union in a period of negotiation covering over five months, March 30,

1966, to September 22, 1966, was admittedly unfair and was made only for strategy reasons. The "hasty" Union acceptance of this proposal was not countered with even "a suggestion" of what would be fair, the Company's response again being only total rejection. Although as the Company suggests, it may not be bound to make counter-proposals, nevertheless, evidence of its failure to do so may be weighed with all other circumstances in considering good faith. And this observation would seem particularly true where, as here, the Company premises its good faith attitude on an asserted continued willingness to compromise rather than on a sincere conviction of their own position. Good faith bargaining presupposes that claims made by either party should be "honest claims" evoking a sincere desire to reach agreement. NLRB v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). Failure to reach an agreement is not the test, but "sincerity of effort" to consummate an agreement becomes a key factor which may disclose a mood indicative of intention not to bargain. NLRB v. National Shoes, Inc., 208 F.2d 688 (2 Cir. 1953). It is true that good faith does not require the yielding of positions genuinely maintained, but this principle is not consistent with the use of insincere proposals as a strategem of negotiation. As Chief Justice Vinson once said: "[T]he Act does not encourage a party to engage in fruitless marathon discussions at the expense of frank statement and support of his position." [8] Such attitude hardly lends itself to a spirit of cooperation to bargain fairly or even to bargain at all. Mere pretense of negotiation is not enough.[9] Judge Matthes said in NLRB v.

---

8. NLRB v. American Nat'l Ins. Co., 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L. Ed. 1027 (1952).

9. In NLRB v. Herman Sausage Co., 275 F.2d 229, 231–32 (5 Cir. 1960), the court said:
"The obligation of the employer \* \* \* does not permit the Board, under the guise of finding of bad faith, to require the employer to contract in a way the Board might deem proper. Nor may the Board '\* \* \* directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements \* \* \*,' for the Act does not 'regulate the substantive terms governing wages, hours and working conditions which are incorporated in an agreement.' N. L. R. B. v. American National Ins. Co., 1952, 343 U.S. 395.

Wonder State Mfg. Co., 344 F.2d 210, 215–16 (8 Cir. 1965):

"The parties are required to deal with each other with an open and fair mind and sincerely endeavor to overcome obstacles or differences existing between them to the end that employment relations may be stabilized and obstruction to the free flow of commerce prevented. National Labor Relations Board v. Montgomery Ward & Co., 133 F.2d 676, 684, 686, 146 A.L.R. 1045 (9 Cir. 1943). See also N. L. R. B. v. W. R. Hall, Distributor, 341 F.2d 359, 362 (10 Cir. 1965), where the Court stated:

" 'Delay, its cause and effect, cooperation between the parties or its lack, preparation for discussion or its lack, and the reasonableness or unreasonableness of demands are among those factors which the fact finder can consider in the difficult task of laying bare the subjective intent of the parties.' "

 In conclusion, we are required to sustain the Board's finding not on our own independent determination but because a finding of absence of good faith is one within the judgment of the Board and cannot be disturbed unless the inferences drawn and the conclusion reached are without reasonable foundation. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456 (1951). We cannot find that deficiency here.

Order enforced.

402, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027, 1036, 1037 affirming American National Ins. Co. v. N. L. R. B., 5 Cir., 1951, 187 F.2d 307.

"On the other hand while the employer is assured these valuable rights, he may not use them as a cloak. In approaching it from this vantage, one must recognize as well that bad faith is prohibited though done with sophistication and finesse. Consequently, to sit at a bargaining table, or to sit almost forever, or to make concessions here and there, could be the very means by which to conceal a purposeful strategy to make bargaining futile or fail. Hence, we have said in more colorful language it takes more than mere 'surface bargaining,' or 'shadow boxing to a draw,' or 'giving the Union a runaround while purporting to be meeting with the Union for purpose of collective bargaining.' "