**TELEPROMPTER CORPORATION
et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**No. 77–1054.**

United States Court of Appeals,
First Circuit.

Argued May 3, 1977.

Decided Dec. 28, 1977.

---

Raymond G. McGuire, Portland, Me., with whom Walter E. Corey, III, and Curtis, Thaxter, Corey, Lipez & Stevens, Portland, Me., were on brief, for petitioners.

W. Christian Schumann, Atty., Washington, D. C., with whom Allison W. Brown, Jr., Deputy Asst. Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Madge F. Jefferson, Atty., Washington, D. C., were on brief, for respondent.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, DOOLING, District Judge.*

LEVIN H. CAMPBELL, Circuit Judge.

At issue is the extent of an employer's duty to furnish profitability data to a union.

* Of the Eastern District of New York, sitting by designation.

**6**

■ An employer is ordinarily empowered to keep from its employees data concerning the profitability of its business, but it may lose that right if it chooses to counter union demands by claiming economic incapacity. *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). In the present case, a parent corporation, Teleprompter, which operates cable TV systems and other enterprises in many states through numerous subsidiaries, announced a wage freeze policy, effective as to employees of subsidiaries, on the ground that its own profits, i. e. those of the parent, were failing. In support of its position, it offered to furnish, and furnished, economic data documenting its own economic condition, but declined to reveal the economic condition of any particular subsidiary. The present case involves three separate unfair labor practice complaints, each brought against the parent, Teleprompter, and one of its cable TV subsidiaries, for failure to comply with a local union's request for data showing the financial condition of the particular subsidiary with which the local was then negotiating. The complaints were consolidated for hearing in Milwaukee, Wisconsin, before an Administrative Law Judge, Teleprompter and each subsidiary being accused of having violated sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5), in that they did not furnish information "necessary and relevant" for the local bargaining representatives to perform their statutory bargaining duties.

After a hearing, the Administrative Law Judge issued a Decision and Order recommending that all charges against the employer be dismissed. The judge found that the employer had no obligation under section 8(a)(5) except to substantiate the accuracy and good faith of its claim of inability to pay and that it had done this. The ALJ also found that since the wage freeze had as its purpose coping with the companywide loss of profits, the profitability of a given subsidiary was not relevant for local bargaining purposes.

The NLRB did not adopt the judge's recommended order but found instead that Teleprompter had violated its duty to bargain in good faith by refusing to authorize its subsidiaries to release local profitability data to the local unions in order to enable them "to intelligently evaluate" the employer's assertions that an across-the-board wage freeze was necessary. Petitions for review and for enforcement followed in this court.

I

Teleprompter is a New York corporation with headquarters in New York City. Through its cable division it operates approximately 139 cable systems in 33 states, some of which are controlled by its wholly or partially owned corporate subsidiaries, and some of which may be operated directly by the parent. Teleprompter also owns other corporations, Filmation and Muzak, which are engaged in different businesses and which constitute other divisions of the parent company. The employees of a number of the cable subsidiaries are represented by labor organizations, approximately 35 of them by locals of the International Brotherhood of Electrical Workers (IBEW).

In the events leading up to the unfair labor practice charges in issue, Teleprompter dealt with IBEW first at the national then at the local level. On January 13, 1975, Mr. Russell Karp, President of Teleprompter, sent a letter to all employees, including those of its subsidiaries, announcing an immediate moratorium on wage increases for both management and non-management personnel. There was an exception only for increases required by pre-existing contracts. The reason for the moratorium was explained as follows:

"Teleprompter will not make a profit in 1974. This is due, in part, to extremely high interest rates and, in part, to a general economic downturn."

The ALJ found that the company wanted "a more favorable cash flow position, and this required getting a $20,000,000 bank loan, which could be accomplished only by demonstrating that there would be no wage increases until its financial situation improved."

On January 14, 1975, Mr. Paul Gillert, Teleprompter's director of industrial relations, requested by telephone a meeting with Mr. Arthur Korff, director of the cable television department of the IBEW, for the purpose of discussing the wage freeze. During the meeting, held on January 27, 1975, there was no discussion of the profitability or unprofitability of any of the local systems and it is undisputed that Teleprompter at no time pointed to any particular subsidiary's performance as justifying its decision. Korff expressed distress that Teleprompter was taking a firm position on the wage freeze instead of leaving it open for negotiation with each local. He thereafter requested certain information and documents comprehensively listed by IBEW's economist so that the International could substantiate independently the company's claim that it could not pay wage increases.

Teleprompter thereafter supplied the IBEW with a considerable body of financial data about the parent company's condition, much of it of a confidential nature, including: a list of cable systems operated by Teleprompter as of March 31, 1972; a "Weekly Connection and Additional Outlets Report" for the week ending February 2, 1975; the 10–K Report for 1973 submitted to the SEC; the first quarter report for 1974; various bank agreements negotiated by Teleprompter with a consortium of creditor banks; a "Consolidated Projection of Sources and Uses of Cash"; a three-year projection of Expenses and Revenues for local origination enterprise; data on the average monthly subscribed rate (system-wide). No claim is made that this information was not adequate to apprise the union of the parent's financial status.

Not satisfied, however, the IBEW asserted that it required data relating specifically to each subsidiary. This was needed, the International said, so that the union's economist could understand the structure of Teleprompter and could "trace labor costs and find out if these costs relative to other cost items on a system basis and on a national basis had somehow gotten out of proportion." If the company's financial problems were not related to the wages paid members of a given IBEW local, the union felt that it should not advise the local to forego a wage increase.

Because the International represented no Teleprompter employees, these exchanges did no more than set the stage for the unfair labor practice complaints here in issue. In early 1975, however, contract negotiations were opened with three IBEW locals representing employees at subsidiary corporations in LaCrosse, Wisconsin, Great Falls, Montana, and Worcester, Massachusetts. Management at each of the subsidiaries put forward Teleprompter's wage freeze policy as requiring refusal of any requested pay raise. In each instance, Mr. Gillert, Teleprompter's director of industrial relations, along with the particular local system manager, negotiated on behalf of management. Mr. Gillert testified that in reviewing wage requests at the local systems level, he customarily considered the manager's recommendations, area wage scales, collective bargaining contracts with other cable TV companies in the area, and wage rates in industries employing technicians with skills similar to those of Teleprompter's employees. In five years of negotiating for the company, Mr. Gillert said he had never considered whether a subsidiary was or was not profitable when making a decision about a wage offer to the employees of that system.

Faced with the parent's company-wide freeze, the bargaining representatives of each of the locals requested detailed information about the profitability of its system including all data that had been requested in Mr. Korff's January 30 letter. Each explained that the information was essential so that the union representative could intelligently evaluate the company policy of a wage freeze. By way of response, Teleprompter provided each local with the same package of information it had given to the International but contended that profitability information about the individual subsidiaries was irrelevant since the profitability or lack thereof of a particular facility had

nothing to do with the moratorium.[1] The profitability of the Teleprompter enterprise as a whole was said to be the sole material factor.

The wage freeze was lifted on October 28, 1975 and contracts covering January 1, 1976 through December 31, 1978 were ultimately executed by Teleprompter and each of the three IBEW locals.

It is significant that while broader charges were initially made by the IBEW and its locals, the complaints were eventually tried solely on the narrow issue of whether respondents violated sections 8(a)(1) and (5) by failing to provide profitability data concerning the three systems in issue. There was no issue of a duty to furnish profitability data on all other subsidiaries comprising the Teleprompter chain for the benefit of the charging locals.

## II

█ The National Labor Relations Act does not specifically provide that an employer furnish information, on request, to the bargaining representative of its employees. However, the section 8 requirement that an employer bargain in good faith has been interpreted as requiring that some types of information be furnished in some situations. In *NLRB v. Acme Industrial,* 385 U.S. 432, 435–36, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967), the Court said, "There can be no question of the general obligation of an employer to provide information that is needed by the bargaining representative for the proper performance of its duties." (*Acme* involved a union request for information needed to "police" an existing contract rather than for bargaining purposes: the union was allowed to discover the facts behind the company's relocation of major machinery, since the move could affect employee rights under the contract.) The "general obligation" described in *Acme* extends in varying degrees of intensity throughout the many aspects of management-union relations, with accommodation

being made between the union's urgent need for some types of information, such as wage data, and the employer's greater relative interest in preserving the confidentiality of other information, such as profitability data. Information pertaining to the mandatory subjects of bargaining—"wages, hours, terms and conditions of employment, negotiation of an agreement, and execution of an agreement", § 8(d)—has been held to be "so intrinsic to the core of the employer-employee relationship that [it is] considered presumptively relevant." *San Diego Newspaper Guild v. NLRB,* 548 F.2d 863, 867 (9th Cir. 1977); *Boston Herald-Traveler v. NLRB,* 223 F.2d 58 (1st Cir. 1955); *NLRB v. Whitin Machine Works,* 217 F.2d 593 (4th Cir. 1954), *cert. denied,* 349 U.S. 905, 75 S.Ct. 583, 99 L.Ed. 1242 (1955); *NLRB v. Item Co.,* 220 F.2d 956 (5th Cir.), *cert. denied,* 350 U.S. 836, 76 S.Ct. 73, 100 L.Ed. 746 (1955). As to this type of information, it is not required "that the union show the precise relevancy of the requested information to particular current bargaining issues". *Boston Herald-Traveler, supra* at 63, quoting Chairman Farmer in the *Whitin* case. "The rule governing disclosure of data of this kind is not unlike that prevailing in discovery procedures under modern codes. There the information must be disclosed unless it plainly appears irrelevant." *NLRB v. Yawman and Erbe Mfg. Co.,* 187 F.2d 947, 949 (2d Cir. 1951) (per curiam). A union request for such data must be honored; refusal constitutes in most instances a *per se* violation of the duty to bargain in good faith.

█ But financial data showing profitability has not been treated in the same manner.

"Certain information in the possession of an employer must be produced if requested by the union, for without that information, collective bargaining would not be possible. Thus, a union can hardly bargain about wages if it has no information about existing wage structures. . .

---

1. The ALJ found that the LaCrosse facility was, in fact, making money, and assumed for purposes of his opinion that the systems in issue were showing a profit. The Board said in its decision that it had no reason to assume that any of the systems were profitable.

[But] [b]argaining about wages surely can proceed, and often does proceed, without the union having information concerning the financial position of the employer. The case, therefore, cannot be equated to one in which there is a demand for information about existing wage rates."

H. Wellington, *Labor and the Legal Process* 61 (1968). Financial data need not be disclosed in the course of contract negotiations unless the bargaining representative first makes a showing that it is specially relevant to the bargaining taking place. *International Woodworkers v. NLRB*, 105 U.S. App.D.C. 37, 263 F.2d 483 (1959) (Burger, J.). The union does not make that showing merely by claiming that the data would be helpful in performing its tasks. *United Furniture Workers v. NLRB*, 388 F.2d 880, 882, 883 (4th Cir. 1967); *see C–B Buick v. NLRB*, 506 F.2d 1086, 1091 (3d Cir. 1974); *Puerto Rico Tel. v. NLRB*, 359 F.2d 983, 986 (1st Cir. 1966). While wages "constitute a percentage of gross profits and gross income" and, in that general sense, profits and income are always relevant to bargaining about wages, "no case has held that gross profits and the deductions therefrom are presumptively relevant in collective bargaining." *United Furniture Workers v. NLRB, supra* at 882.

■ However, when the employer itself puts profitability in contention—as by asserting an inability to pay an increase in wages—information to substantiate the employer's position has to be disclosed.

"If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy. . . . We agree with the Board that a refusal to attempt to substantiate a claim of inability to pay increased wages may support a finding of a failure to bargain in good faith."

*NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 152–53, 76 S.Ct. 753, 756, 100 L.Ed. 1027 (1955).[2]

■ The present case presents the narrow question of the extent of the required disclosure in rather unique circumstances following a plea of poverty. The ALJ felt that Teleprompter, the parent, had done everything *Truitt* required, since it had substantiated the basis for its blanket refusal to allow any subsidiary to raise wages. As the freeze was based on the economics of the parent's position overall, not that of any particular subsidiary, the ALJ felt that the economics of the subsidiary with which a given local union was bargaining were irrelevant. The Board, on the other hand, took the view that both the ALJ's reading of *Truitt* and his concept of relevancy were too strict, and that the question of the profitability of the very company for which the affected employees worked became of sufficient particularized relevance to require disclosure once the parent had declared its own inability to allow a wage hike. The Board, of course, has the final say when the choice is "between two fairly conflicting views." *Universal Camera Corp. v. National Labor Relations Board*, 350 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1950). Here, while the ALJ's position is not without some force, the Board's position seems to us to have at least equal merit, and therefore to be entitled to enforcement.

The Board adopted the theory that an employer pleading an inability to pay must substantiate its position by presenting "adequate information enabling 'the union to intelligently determine whether the [Employer] was making its best offer'", citing *Tony's Meats, Inc.*, 211 NLRB 625 (1974).

**2.** While the *Truitt* court limited its holding, stating,

"We do not hold, however, that in every case in which economic inability is raised as an argument against increased wages it automatically follows that the employees are entitled to substantiating evidence",

the case has become widely accepted as establishing for all practical purposes, just such an "automatic" rule. *C–B Buick v. NLRB*, 506 F.2d 1086, 1091 (3d Cir. 1974); *NLRB v. Bagel Bakers Council*, 434 F.2d 884, 888 (2d Cir. 1970), *cert. denied*, 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 648 (1971); *NLRB v. Southland Cork Co.*, 342 F.2d 702, 706 (4th Cir. 1965); *see N.Y. Printing Pressmen v. NLRB*, 538 F.2d 496, 500, 501 (2d Cir. 1976); *NLRB v. Palomar*, 465 F.2d 731, 734 (5th Cir. 1972).

"By limiting its offer of proof concerning inability to pay, Respondent was withholding information essential to the Locals. We do not believe that the goal of bargaining in good faith is served by such a limited offer and we do not believe that an employer claiming inability to pay may arbitrarily limit its obligation to provide financial data to substantiate its claim by limiting the claim itself. Likewise we do not believe that an employer which has generally opted for single location or system bargaining as opposed to area or nationwide bargaining should then be allowed to make a nationwide 'plea of poverty' without providing data as to the single or local systems. Regardless of what factors the Employer takes into consideration in determining the wage structure at a particular facility, clearly it is essential for each local to have profitability statements regarding the local system whose employees it represents so it may knowledgeably consider Respondent's position."

The Board felt that in bargaining with a particular subsidiary, the local union would have difficulty both in determining whether itself to accept, and whether to urge its members to accept, the employer's offer, since it would be in the dark as to what extent the company for which its members worked had "contributed to the difficulties". It might not know whether to continue to press for a wage increase or to make an alternative request, see *B. L. Montague Company*, 116 NLRB 554 (1956). It might be frustrated in explaining its position to its members.

We think the Board could properly find that in order to substantiate each corporate subsidiary's bargaining position, as *Truitt* requires, respondents had to go beyond providing the overall information which prompted the parent to announce a wage freeze. The "employer" in each of the three instances was the subsidiary, not the parent. To be sure, the relationship between parent and subsidiary was so close that local negotiations were being managed by the parent's director of industrial relations, and the parent had directly notified the employees of each subsidiary of the wage freeze, as if they were employees of its own. Still, the subsidiary was the employer, and its employees, who constituted a separate bargaining unit, would be curious, and legitimately so, of their immediate employer's financial status upon being told that the parent had declared itself too poor to allow a wage increase. The bargaining in progress, as Teleprompter's director of industrial relations testified, typically focused on wages and conditions in the area where each subsidiary conducted its business, thus it would be natural for the subsidiary's employees, in contemplating the wage freeze, to be as concerned with the economic capability of the subsidiary as with the parent's broader financial situation. To be sure, such a question might, as the ALJ believed, be irrelevant from the parent's perspective, but given the two-tier arrangement, we cannot say that it was irrelevant from the point of view of the local, which would be considering whether or not to counter the parent's wage freeze by emphasizing the solvent condition of its members' immediate employer.

The respondents argue that the Board's position amounts to enforcing the production of any information which employees imagine may be helpful, no matter how logically unnecessary to "substantiate" the employer's claim. *Truitt, supra*. We disagree. It does not follow that, absent the parent's plea of poverty, the subsidiary would have had to disclose its own profitability, nor that an employer's plea of poverty makes all books and records discoverable. The subsidiary's financial data became relevant here solely because of its relationship, in a bargaining context, to the parent's claim of financial inability. We do not read *Truitt*, especially after *Acme*, as limiting the employer's disclosure to less than is reasonably necessary to permit a union to make a meaningful evaluation, from its members' perspective, of the claim of finan-

cial inability.[3] The Board's position here, which took account of the employees' natural focus of inquiry in response to the parent's wage freeze announcement, seems fair enough in the circumstances. The employer may not limit the relevant information disclosed to just those fragments which satisfy its own view of the issue.

█ This is not to say that a plea of poverty triggers carte blanche discovery rights. The unqualified discovery-type rule enunciated first in *NLRB v. Yawman and Erbe Mfg. Co.*, 187 F.2d 947, 949 (2d Cir. 1951), and adopted in this circuit in *Boston Herald Traveler v. NLRB*, 223 F.2d 58 (1955), though sometimes cited in this type of situation, *see, e. g., NLRB v. Celotex Corp.*, 364 F.2d 552 (5th Cir.), *cert. denied*, 385 U.S. 987, 87 S.Ct. 601, 17 L.Ed.2d 450 (1966), does not seem to us to be tailored to it. The union is entitled only to what is reasonably necessary properly to represent its members in light of the employer's triggering claim of financial inability. *See NLRB v. Acme Industrial, supra.*

In affirming, we observe that both the ALJ and Board specifically describe the narrow claim under adjudication as the availability of information concerning the profitability of the particular facility with which each of the three locals was negotiating. The Board's decision itself, while for the most part addressed to this issue, occasionally seems to suggest that the bargaining representative of a given subsidiary may also be entitled to profit and loss information as to each of Teleprompter's over 100 subsidiaries. As this was not the question in issue, we would not, on the present findings and record, approve any such broad interpretation of the Board's order. The locals' need for such additional information has not been established, and we do not interpret the Board's order as reaching any such data. The Board's order is, of course, further limited to the production of information relevant to bargaining in the period during which Teleprompter's plea of poverty and wage freeze was in effect: after the wage freeze was lifted, and new contracts were negotiated, respondents regained their normal right with regard to the confidentiality of subsequent profitability data.

█ Finally, we do not accept respondent's argument that we should refuse enforcement of the Board's order because of mootness or lack of relevancy to any current or future bargaining, *see C–B Buick, Inc. v. NLRB, supra*, 506 F.2d at 1092. The case is plainly not moot, *NLRB v. Pearl Bookbinding Company, Inc.*, 517 F.2d 1108, 1114 (1st Cir. 1975); *C–B Buick, Inc. v. NLRB, supra* at 1092–93, and cases cited therein. The viability of the rule of limited enforcement presented in *C–B Buick* now seems questionable in its originating circuit, *see NLRB v. International Union of Operating Engineers*, 532 F.2d 902 (3d Cir. 1976), *cert. denied*, 429 U.S. 1072, 97 S.Ct. 808, 50 L.Ed.2d 789 (1977). While in exceptional circumstances, *see, e. g., NLRB v. H. P. Hood, Inc.*, 496 F.2d 515 (1st Cir. 1974), we might remand to the Board or take other remedial steps in connection with outdated orders, practicality demands that in most

---

**3.** It is true that *Truitt* speaks merely of "substantiation" of the employer's claim of financial inability, using at one point the modest phrase, "some sort of proof". *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 152, 76 S.Ct. 753, 100 L.Ed. 1027 (1955). But, as the Court in *Truitt* stated, there was no dispute in that case concerning the scope or burdensomeness of the Board's order: the litigated issue was not how much information to supply but whether any at all was required. Since *Truitt*, the Board and circuit cases have dealt pragmatically with the question of how much evidence need be provided. Formulations have ranged from "full disclosure", *ITT v. NLRB*, 382 F.2d 366, 371 (3d Cir. 1967), *cert. denied*, 389 U.S. 1039, 88 S.Ct. 777, 19 L.Ed.2d 829 (1968), to "a reasonable amount of explanation and elaboration", *Metlox Mfg. Co. v. NLRB*, 378 F.2d 728, 730 (9th Cir. 1967), *cert. denied*, 389 U.S. 1037, 88 S.Ct. 771, 19 L.Ed.2d 824 (1968). In the present era, we think "substantiation" cannot be read as meaning just the bare minimum needed to show that the employer's claim is nonfrivolous; rather, in keeping with *NLRB v. Acme Industrial*, 385 U.S. 432, 435–36, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967), we think it means revealing such information as the bargaining representative reasonably requires in order meaningfully to evaluate the employer's claim of a financial inability to pay.

**12**

cases the courts enforce such orders. Were we to do otherwise, parties would be given an incentive to seek delay by litigating and the already burdened resources of the courts and the Board would be further taxed by the need to reconsider and refine orders in light of constantly changing conditions.

*Enforcement granted.*