603 F.2d 1310
 102 L.R.R.M. (BNA) 2128, 86 Lab.Cas. P 11,520
 The PROCTER & GAMBLE MANUFACTURING COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Association of Employees of the Procter & Gamble
Manufacturing Company's St. Louis Plant,
Intervenor-respondent.
 No. 78-1716.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 12, 1979.
Decided Aug. 23, 1979.
 
 Harold S. Freeman of Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, argued and Michael S. Glassman, Cincinnati, Ohio, on appendix and briefs, for petitioner.
 Edward S. Dorsey, Atty., N. L. R. B., Washington, D.C. argued, and Andrew E. Tranovich, Atty., John S. Irving, Gen. Counsel; John E. Higgins, Jr., Deputy Gen. Counsel; Robert E. Allen, Acting Assoc. Gen. Counsel; and Elliott Moore, Deputy Assoc. Gen. Counsel, Washington, D.C., on brief, for respondent.
 Before LAY, ROSS and McMILLIAN, Circuit Judges.
 McMILLIAN, Circuit Judge.
 
 
 1
 The Procter & Gamble Manufacturing Company (the Company) petitions this court, pursuant to § 10(f) of the National Labor Relations Act, 29 U.S.C. § 151, Et seq., (the Act) to review a decision and order of the National Labor Relations Board (the Board). The Board affirmed the rulings and findings of the Administrative Law Judge (ALJ) and adopted her recommended order.[1] The decision and order found that the Company violated § 8(a)(5) and (1) of the Act by refusing to comply with a union request for job evaluation information, where the requested information was needed by the union to evaluate whether to pursue salary-related grievances to arbitration. The Board ordered the Company to turn over the disputed information, post compliance notices, and cease and desist from like or related practices. The Board, pursuant to § 10(e) of the Act, cross-appeals for enforcement of its order. On October 24, 1978, we permitted the Association of Employees of the Procter & Gamble Manufacturing Company's St. Louis plant (the Union) to intervene in these proceedings.
 
 
 2
 We find that there is substantial evidence on the record as a whole to support the Board's decision, and, accordingly, deny the petition for review and order enforcement of the order.
 
 
 3
 Since 1937, the Union has been the exclusive representative for the bargaining unit of production and salaried office clerical employees at the Company's St. Louis plant. The present controversy arose in June, 1976, when two clerical employees filed separate written grievances alleging discrimination in job evaluation. Both employees alleged that their duties and job descriptions were the same as higher job classifications but both were classified in lower salary ranges.
 
 
 4
 The parties' collective bargaining agreement contains two sections relevant to this case. Article III, § 6, permits the Job Evaluation Representative, a representative of the Union, to be heard before and after the evaluation or reevaluation of a job, but not to sit in on the evaluation itself. It also permits the Union representative to present his views concerning the job descriptions and evaluations, but does not permit him to participate in the actual rating. Finally, this section provides that the employer will train the Union representative in the theory and practice of job evaluations. Article VIII of the agreement provides for a four-step grievance procedure covering any matter involving The interpretation or application of any provision of the agreement, or any matter affecting the employee in respect to work, wages or working conditions, culminating in final and binding arbitration. (Emphasis added).
 
 
 5
 Since 1940 the Company has had a job evaluation plan. Although the agreement refers to job evaluation, the provisions of the job evaluation plan are not specifically set forth in the agreement. The job evaluation plan is a complicated, highly sophisticated plan used by the Company to determine job classifications and salaries. The job evaluation committee determines the salary range for each position. The committee is chaired by the Company's personnel manager, who appoints four other department heads. When a job is to be evaluated or reevaluated, the five management representatives rate each of eight factors on a one to ten scale: (1) complexity; (2) experience and training; (3) contact with others; (4) dexterity; (5) concentration; (6) accuracy; (7) working conditions; and (8) responsibility. After rating each factor, the management representatives refer to a ladder chart which contains a breakdown of where each job falls within the ten point spread for each of the eight factors.
 
 
 6
 After the management representatives have rated a factor, the points for that factor are averaged and the average for each factor is multiplied by a weighted percentage factor. The weighted points for each of the eight factors are then totalled and placed in a rate group based upon the total points. There are seven pay groups for the salaried jobs Groups A to G. Each group has a different wage range. The seven pay groups have a one hundred point spread. If a job falls near the top of the point range, and additional duties are added so that when the job is evaluated or reevaluated the total points go into the point range of the next pay group, the job will receive higher wages.
 
 
 7
 Although the Union representative is permitted to attend job evaluations and reevaluations, he does not have a copy of the twenty-page job evaluation manual, does not have copies of the job descriptions, and does not have copies of the summary sheets or the ladder charts. The Union's representative is neither given anything in writing nor permitted to take notes. Nor, because of the Company's policy that rating factors and point information are confidential, is the Union's representative permitted to make copies of this material or to disclose any information received pertaining to the job evaluations to any other person, including the members of the grievance committee.
 
 
 8
 Both grievances filed by the two employees proceeded along parallel paths through the four-step grievance procedure. At each step the Company denied each grievance. Upon receipt of the fourth-step answer or denial, the Union's grievance committee asserted that it was unable to decide whether to recommend that these grievances go to arbitration. Consequently, it turned over all the information it had on file to the Union's attorney, who also was an industrial engineer, with extensive experience in job evaluations. After the Union's attorney had reviewed the files, he requested from the grievance committee chairperson other information and documents that he considered necessary to evaluate the merits of the grievances.
 
 
 9
 Being unable to obtain the sought after information from the chairperson, the attorney drafted a letter for the chairperson's signature and mailed it to the plant manager. After informing the Company that the requested information was necessary in order to evaluate the grievance and to decide whether to process it for arbitration, the letter requested copies of the applicable job evaluation manual, which set forth the rating procedure, the rating factors, factor definitions, current job descriptions for clerk positions and any changes in job descriptions in the previous five years; the original evaluation sheet; the original reevaluation comparison sheet for those positions and fact breakdowns for the past three years; the most recent rating sheets used by the evaluators in reevaluating these positions; and the point spread for each rate group.
 
 
 10
 In response to the Union's request, the Company, after a reference to Article III, § 6, of the agreement, replied that the Company would be happy to meet with the Union representative and answer questions. The Company further directed the Union representative to contact the job evaluation plan chairperson to arrange a meeting.
 
 
 11
 Upon the receipt of the Company's reply, the Union filed an unfair labor charge, alleging a § 8(a)(5) and (1) violation of the Act by the Company's refusal to furnish the requested information.
 
 
 12
 The Board found that the Union had a statutory right to the requested information, because it was relevant to the Union's role as bargaining representative; that each requested document was an integral part of the job evaluation scheme which concerns the compensation of bargaining unit employees and was directly relevant to the Union's evaluation whether to submit the grievances to arbitration; and that no waiver of the right of access to this job evaluation information occurred. The Board further found that the Company's obligation to furnish the requested information was not fulfilled by its offer to meet and answer questions because (1) the job evaluation representative was not a member of the grievance committee, and (2) the job evaluation representative was prohibited from releasing most of the information to anyone.
 
 
 13
 The question for decision is whether substantial evidence on the record as a whole supports the Board's finding that the Company violated § 8(a)(5) and (1) of the Act by refusing to supply requested relevant job evaluation information that was needed by the Union to pursue a salary-related grievance to arbitration.
 
 
 14
 The duty to bargain in good faith requires an employer to furnish information that the bargaining representative needs for the proper performance of its duty. A failure to so provide constitutes a refusal to bargain in violation of § 8(a)(5) and (1) of the Act. NLRB v. Acme Industrial Co., 385 U.S. 432, 435-36, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); NLRB v. Truitt Mfg. Co., 351 U.S. 149, 151-54, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). This obligation extends to the Union's need for information during the administering and policing of a contract as well as during contract negotiations. NLRB v. Acme Industrial Co., supra, 385 U.S. at 435-36, 87 S.Ct. 565; Western Massachusetts Electric Co. v. NLRB, 589 F.2d 42, 46 (1st Cir. 1978); Puerto Rico Telephone Co. v. NLRB, 359 F.2d 983, 986 (1st Cir. 1966). To refuse to furnish such relevant information violates the Act, irrespective of the employer's good or bad faith, because it conflicts with the statutory policy to facilitate effective collective bargaining. Curtiss-Wright Corp. v. NLRB,347 F.2d 61, 68 (3d Cir. 1965); Accord, NLRB v. Ramona's Mexican Food Products, Inc., 531 F.2d 390, 394 (9th Cir. 1975).
 
 
 15
 Information pertaining to the wages, hours and working conditions of employees in the bargaining unit is so intrinsic to the core of the employer-employee relationship that it is considered presumptively relevant. San Diego Newspaper Guild v. NLRB, 548 F.2d 863, 867 (9th Cir. 1977); Accord, Teleprompter Corp. v. NLRB, 570 F.2d 4, 8 (1st Cir. 1977); NLRB v. Western Electric, Inc., 559 F.2d 1131, 1133 (8th Cir. 1977); Curtiss-Wright Corp. v. NLRB, supra, 347 F.2d at 69. When dealing with such information for bargaining unit employees, the Ninth Circuit held in San Diego Newspaper Guild that the employer had the burden of proving a lack of relevance. 548 F.2d at 867. See also Prudential Insurance Co. v. NLRB, 412 F.2d 77, 84 (2d Cir.), Cert. denied, 396 U.S. 928, 90 S.Ct. 263, 24 L.Ed.2d 226 (1969). Moreover, as to this type of information, the union is not required to show the precise relevancy of the requested information to particular current bargaining issues. Teleprompter Corp. v. NLRB, supra, 570 F.2d at 8, Citing Boston Herald-Traveler v. NLRB, 223 F.2d 58, 63 (1st Cir. 1955). And, as the Supreme Court stated in United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960), "(t)he grievance procedure is . . . part of the continuous collective bargaining process."
 
 
 16
 In determining whether an employer is obligated under the statute to supply particular information, the Board need only find a probability that the desired information is relevant and that it will be of use to the union in carrying out its statutory duties and responsibilities. NLRB v. Rockwell-Standard Corp., 410 F.2d 953, 957 (6th Cir. 1969), Citing with approval NLRB v. Acme Industrial Co., supra, 385 U.S. at 437, 87 S.Ct. 565. The Supreme Court in Acme Industrial noted that the relevancy issue should be determined under a "discovery-type standard," 385 U.S. at 437, 87 S.Ct. 565, not a trial-type standard; hence, a broad range of potentially useful information should be allowed to the union for the purpose of effectuating the bargaining process, unless it is clearly irrelevant. Once relevance is established, a refusal to furnish the requested information is per se a violation of the Act. C-B Buick, Inc. v. NLRB, 506 F.2d 1086, 1091 (3d Cir. 1974); Curtiss-Wright Corp. v. NLRB, supra, 347 F.2d at 69.
 
 
 17
 What is or is not relevant depends on the particular facts in each case. E. g., NLRB v. Pearl Bookbinding Co., 517 F.2d 1108, 1113 (1st Cir. 1975). Accordingly,
 
 
 18
 the Board's determination as to whether the requested information in a particular case is given great weight by the (Court) either because it is a question of fact, which is conclusively supported by substantial evidence . . . , or because it is a finding on a mixed question of law and fact which is within the peculiar expertise of the Board.
 
 
 19
 San Diego Newspaper Guild v. NLRB, supra, 548 F.2d at 867 (footnotes omitted). Using this liberal standard of presumptive relevance as a guideline, we hold that the Board could properly conclude that, because the requested information concerned the compensation of bargaining unit employees and was needed to evaluate whether to arbitrate grievances alleging discriminatory job evaluations, the Company breached its statutory duty by failing to provide such relevant information.
 
 
 20
 Even the Company does not deny that a grievance can be filed over the results of a job evaluation. The Company argues, however, that the job evaluation program is not subject to arbitration because job evaluation does not involve an application or interpretation of any provision of the bargaining agreement in that the Company's job evaluation plan is not incorporated in the agreement. The Company further cites us to our case of Brown v. Sterling Aluminum Products Corp., 365 F.2d 651 (8th Cir. 1966), Cert. denied, 386 U.S. 957, 87 S.Ct. 1023, 18 L.Ed.2d 105 (1967), for the proposition that the arbitration clause in the agreement limits arbitration to questions involving the application or interpretation of provisions of the agreement. From this the Company concludes that if its job evaluation plan is not included in the agreement, but rather is a separate plan, then there is no obligation to submit disputes regarding the plan to arbitration. Our present case is distinguishable, because in the Brown case we found that there was "No agreement contained in the collective bargaining contract to submit any question of interpretation of the contract to arbitration, nor (was) there any agreement (in the contract) to settle disputes thereunder by submission to an arbitrator or some other board." 365 F.2d at 658. Because of this we said there was a fatal defect in the contract. Id. Here, however, compulsory arbitration is provided for in Article VIII of the agreement.
 
 
 21
 Nor do we find United Steelworkers v. General Steel Industries, Inc., 363 F.Supp. 840 (E.D.Mo.1973), Aff'd in part and rev'd in part, 499 F.2d 215 (8th Cir. 1974), apposite. In General Steel Industries we held that grievances were arbitrable even though the insurance, pension and supplemental unemployment benefits were contained in agreements separate from the bargaining agreement. 499 F.2d at 218, 219. We also noted that the grievances involved not only the plans but also the interpretation of provisions of the agreement. In the present case, the agreement provides for job evaluation, in Article III, § 6, and further provides that neither the Union nor the Company will discriminate against any employee. Article I, § 8, p. 7. Here, both grievances alleged discrimination in job evaluations, and discrimination against the grievants was discussed in Steps 3 and 4 of the grievance procedure. Thus, whether the two grievants were discriminated against in the evaluation of their jobs in relation to other clerical jobs is a matter, in our opinion, that involves the interpretation of provisions of the agreement.
 
 
 22
 In any event, the sole purpose of the Company's job evaluation plan is to determine the salary range for each clerical position by placing each position into one of seven lettered categories. The placement of a clerical position into a lower instead of a higher lettered category causes a salary differential. When the two grievants filed grievances contending that their positions were improperly placed in a lower lettered category than each employee thought appropriate, in effect they were contending that the Company was not paying them enough money for the work they were performing. To determine whether to submit these grievances to arbitration, the Union needed the requested information to determine whether, as the grievants contended, the duties they performed were similar to other clerk positions which were placed into a higher grade.
 
 
 23
 The job evaluation manual is relevant because it explains the operation of the job evaluation plan, including the factors used to evaluate clerical positions, the definition of these factors, and the weight assigned to each factor. The current job descriptions for departmental clerks are needed to compare duties with those duties performed by the grievants. The changes to the departmental clerks positions are needed to determine whether any additional duties or responsibilities were added to these positions resulting in their being placed into a higher letter category and when reevaluations are deemed necessary. The original evaluation sheets, reevaluation comparison sheets, summary sheets, and the most recent rating sheets are needed to determine possible discrepancies in evaluating the positions and to compare how the members of the evaluation committee evaluated similar job duties found in the job descriptions of the two grievants and the higher-evaluated departmental clerk positions. Finally, the point spread for each lettered category is needed to assess whether the jobs of the two grievants are so near the breakpoint that one evaluation factor might place it into a higher salary range.
 
 
 24
 We attach no merit to the Company's assertion that the information sought was available from other sources. True, the employees were permitted to see their own job descriptions on request, but they were not allowed to have a copy. Similarly, the Union's grievance committee is permitted to see only the grievants' job descriptions, but they are not allowed to have copies or to see the job descriptions for any alleged positions having similar duties but in a higher lettered category. The grievance committee is permitted neither to see the job evaluation manual, the evaluation sheets, the summary sheets, the rating sheets, the ladder chart, the spread for each letter category, nor any of the other requested documents. None of the requested documents is in the possession of the job evaluation representative, the grievance committee or any other union member. Even the Company admits that copies of the requested document can only be obtained from it, and stipulated that duplication of the requested documents would not be burdensome. By the Company withholding this requested information, the Board could have reasonably assumed that it did so either to force the Union to abandon the two grievances, and thereby risk a breach of its duty of fair representation or to force the Union to take the grievances all the way through to arbitration without an opportunity to evaluate the merits of the claim. "Nothing in federal labor law requires such a result." NLRB v. Acme Industrial Co., supra, 385 U.S. at 438-39, 87 S.Ct. at 569.
 
 
 25
 We reject the Company's argument that it had fulfilled its bargaining obligation to the Union by offering to meet with the Union's job evaluation representative and answer questions. As found by the Board, we too find this unresponsive to the Union's request. First, it is the grievance committee, not the Union's representative, which has the obligation on behalf of the Union to evaluate the two grievances and to recommend whether to submit them to arbitration.
 
 
 26
 Simply meeting with the job evaluation representative as offered by the Company will not suffice because the job evaluation representative is permitted only to look at the requested documents, but not to make any copies. In fact, the Union's job evaluation representative is precluded by the Company from taking notes or divulging to anyone the rating process. These restrictions make it impossible for the Union to evaluate the bargaining unit employees' grievances and insure that, even if the Union submits them to arbitration, there would be no way that the Union could sustain its burden of proving that the classification of the jobs of the two grievants was discriminatory. Under these circumstances, the alleged confidentiality of relevant economic data needed for informed bargaining is no defense for the Company's refusal to supply the disputed information. NLRB v. Arkansas Rice Growers Cooperative Ass'n, 400 F.2d 565, 567 (8th Cir. 1968); NLRB v. Frontier Homes Corp., 371 F.2d 974, 979 (8th Cir. 1967).
 
 
 27
 Finally, we hold that the Board properly rejected the Company's argument that the Union was not entitled to the data and information because of a waiver. For there to be a waiver of a right to information, the language used must be clear and unmistakable. Likewise, there must be a conscious relinquishment by the Union, clearly intended and expressed to give up the right. Timken Roller Bearing Co. v. NLRB, 325 F.2d 746, 750-51 (6th Cir. 1963), Cert. denied, 376 U.S. 971, 84 S.Ct. 1135, 12 L.Ed.2d 85 (1964); NLRB v. Item Co., 220 F.2d 956, 958-59 (5th Cir.), Cert. denied, 350 U.S. 836, 76 S.Ct. 73, 100 L.Ed. 746 (1955); See also General Electric Co. v. NLRB, 414 F.2d 918, 923-24 (4th Cir. 1969), Cert. denied, 396 U.S. 1005, 90 S.Ct. 557, 24 L.Ed.2d 496 (1970). Here the Company's defense of waiver is not founded on any clear and unmistakable language in the agreement because there is no express language therein to support its position that the Union had waived its statutory right to the requested job evaluation data and information for purposes of investigating and evaluating grievances. Nor do we find any side agreement wherein the Union waived its statutory right to the disputed information.
 
 
 28
 The Company's reliance upon the 1958 collective bargaining negotiation to support its contract waiver argument is misplaced. First, it must show more than that the Union yielded its initial bargaining position during the 1958 negotiations that it should have all the Company's job evaluation information for all purposes. It must go further to show that the parties intended to limit the Union's statutory right to the information. Yet, at no point in the negotiations did either party even discuss the Union's statutory right to job evaluation information. Likewise, we find no indication in the record that the Union bargained for a concession from the Company in exchange for a limitation on its statutory right to information. Indeed, the selective portions of the transcripts of the 1958 negotiations show nothing more than that the Union believed that a signed bargaining agreement without a contractual right to information was better than continued insistence upon a possible strike to force acceptance of such a provision. E. g., NLRB v. Yawman & Erbe Mfg. Co., 187 F.2d 947, 949 (2d Cir. 1951) (per curiam). Secondly, we find no support for the Company's contention for waiver in the monthly meetings between the parties. From 1946 to 1977, the Union continuously confronted the Company with the necessity of having contractual access to the job evaluation information to review each job evaluation or else only those job evaluations that might be grieved. We have considered at length all the arguments made by the Company to support waiver and find them to be without merit.
 
 
 29
 We have fully considered each of the Company's contentions and find them to be non-meritorious. Accordingly, we deny the Company's petition for review and order enforcement of the Board's order.
 
 
 30
 ROSS, Circuit Judge, concurring.
 
 
 31
 I concur reluctantly in the result reached by the majority opinion. I have grave doubts that the grievances in question are arbitrable and if they are not, this would be a valid defense to the production of the documents requested solely for the purpose of determining whether to arbitrate. However, because the contract does not specifically deny the right to arbitrate grievances of this nature and because of the rebuttable presumption of arbitrability in § 301 type cases, United Steelworkers v. General Steel Industries, Inc., 499 F.2d 215, 219 (8th Cir. 1974), I believe the arbitrator must make the initial decision in this case as to arbitrability. This result, although somewhat unfair, was dictated by the Supreme Court in NLRB v. Acme Industrial Co., 385 U.S. 432, 436-39, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967), where the Court upheld the Union's statutory right to discovery prior to arbitration. If the arbitrator decides that the grievances are not arbitrable, I assume that the Company will then be free to resume its position that information of the type requested need not be made available to the Union in future grievance cases.
 
 
 
 [1]
 The Board's decision and order are reported at 237 NLRB No. 110