NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

DAVID FRIEDLAND PAINTING CO., Inc., Respondent.

The Painting and Decorating Contractors of America, Inc., Intervenor.

No. 16032.

United States Court of Appeals Third Circuit.

Argued Jan. 19, 1967.

Decided April 25, 1967.

Stark v. Fullerton Trucking Co., 318 Pa. 541, 179 A. 84 (1935).

10. See Sleek v. J. C. Penney Co., 324 F.2d 467, 478 (3 Cir. 1963).

Solomon Hirsh, National Labor Relations Board, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Peter M. Giesey, Atty., National Labor Relations Board, on the brief), for petitioner.

Ernest Prupis, Elizabeth, N. J. (Weltchek & Weltchek, Elizabeth, N. J., on the brief), for respondent.

A. E. Robert Friedman, Brooklyn, N. Y., amicus curiae.

Before HASTIE, GANEY and SEITZ, Circuit Judges.

## OPINION OF THE COURT

GANEY, Circuit Judge.

This case is before us on petition of the National Labor Relations Board for enforcement of its order against an employer, David Friedland Painting Co., Inc. ("Friedland"). The Board found that Friedland had violated § 8(a) (1)

and § 8(a) (3) of the National Labor-Management Relations Act, 29 U.S.C.A. § 8(a) (1) and (3), by locking out nine employees who were members of Local 144 of The International Brotherhood of Painters, Decorators and Paperhangers of America, AFL-CIO ("Brotherhood of Painters"), because the members of that Local had struck against the employer-members of Master Associated Painters of Perth Amboy and Vicinity ("Perth Amboy Association"). The Board's decision and order are reported at 158 NLRB No. 59 (1966). The basic facts are not in dispute.

In the State of New Jersey there are approximately nineteen locals of the Brotherhood of Painters. Each local has a specific territorial jurisdiction in the State. Within each of these there is an association of painting contractors in the building and construction industry which, on behalf of its members, bargains exclusively with the local of that area. Such multi-employer unit does not directly participate in the bargaining negotiations in an area other than its own. Painting contractors, who are not members of the area association and therefore do not participate in the bargaining negotiations, desiring to use the services of a local's hiring hall must sign an existing area bargaining agreement. Those signing, along with members of an association, are considered union painting contractors.

Friedland, with an office only in Elizabeth, N. J., is a member of The Union Painters Association of Greater Elizabeth and Vicinity ("Elizabeth Association"), and at all times pertinent here was bound by a bargaining agreement with Local 1221 of the Brotherhood of Painters, which has jurisdiction over

that area. That agreement provides that an employer bound by the terms thereof who performs work in an area outside the territorial jurisdiction of Local 1221 agrees to abide by the wage rates, hours and other conditions of employment set forth in the prevailing agreement of the Brotherhood of Painters' local having jurisdiction over that area. Each of the other eighteen area bargaining agreements contains a similar provision.

Friedland has dealt with thirteen of the locals in New Jersey and during the past three years has done more than $100,000 worth of painting work in the territorial jurisdiction of Local 144.[1] It is also a member of the Garden State Painters Association which has a membership of over 200 union painting contractors in New Jersey. That association has no direct organizational connection with the various local area associations that bargain with the locals in their respective areas, and it does not bargain with any of the locals.[2]

In January of 1965, Local 144 began negotiations with the Perth Amboy Association to replace a bargaining agreement which was to expire on April 1, 1965. This local had about 150 members.[3] In part, the boundaries of Local 144 and Local 1221 adjoin each other. On April 19, 1965, Friedland contacted the business agent of Local 1221 and requested men for work to be performed at a plant in Linden, N. J., which is within the territorial jurisdiction of Local 1221. Since that local had no men on its waiting list, Friedland was free to call the business agent of any other local of the Brotherhood of Painters. Although it knew that members of Local 144 were working under an expired con-

1. Friedland has been paying his employees the wage rate of the area in which it performs the work. However, if that rate was lower than that of the Local 1221 area, then it would pay members of Local 1221 working on the job the higher rate. Prior to May 10, 1965, at least, the wage rate of the Local 1221 area was higher than that of the Local 144 area.

2. There are members of the local area associations who are not members of the Garden State Painters Association.

3. The Business Manager of Local 144 testified before the Board that seventy-five percent of the painting work by Local 144 members was performed outside the territorial jurisdiction of that local. The Board made no finding on this point.

tract, that contract negotiations were pending between Local 144 and the Perth Amboy Association, and that it could have contacted business agents of other locals, Friedland nevertheless called Local 144 and obtained the nine necessary additional employees for the painting job at the Linden plant; all nine men were members of Local 144. They reported at the Linden plant on April 20, and proceeded to work for Friedland.

On Friday night, April 30, Friedland received a telephone call from the Perth Amboy Association that an impasse in bargaining negotiations had been reached with Local 144 and that the latter had decided to call a strike the next day, Saturday, May 1, against members of the Perth Amboy Association. The decision to strike had been approved by the vote of the members of Local 144, and the nine members of Local 144 working at the Linden plant participated in that vote. Members of Local 144 would not work for any employer in the Perth Amboy and vicinity area during the strike period unless he was a union painting contractor and signed an agreement to apply retroactively to May 1 the provisions of the expected new contract between Local 144 and the Perth Amboy Association.[4] The employees at the Linden plant worked all through the next day, Saturday, May 1, but in the evening of that day, the nine members of Local 144 were told by Friedland not to report for work at the Linden plant on Monday, May 3, because Local 144 was on strike against the Perth Amboy Association. Despite this notice, they reported for work at the Linden plant on Monday and although work was available they were barred from working there by Friedland's foreman.[5] The remaining three employees, two of whom were members of Local 1221, continued to work. The nine who were laid off or locked out were not replaced. Three days later, Thursday, May 6, because the person in charge of the operation of the Linden plant had threatened to terminate the painting contract with Friedland unless the job was fully manned, the nine members of Local 144 were recalled. Four days later, Monday, May 10, the strike was called off. The nine men in question also participated in that decision. When the Linden plant job was completed on or about May 28, 1965, the employment of the nine members of Local 144 with Friedland was terminated.

After Friedland refused to make the nine men whole for the three days, from May 3 to 5 inclusive, during which they were locked out, they filed unfair labor charges against it with the Board on July 5, 1965.

The Board did not find nor is there any direct or specific evidence in the record to support a finding that Friedland, in selectively laying off or locking out the nine members of Local 144, possessed an anti-union motivation. It concluded that Friedland's business interest in the labor dispute was a collateral or indirect one. Accordingly, the Board stated that a balancing of Friedland's interest against the rights of its employees under § 7 of the Act, 29 U.S.C.A. § 157, leads inevitably to the conclusion that the § 7 rights of the employees are paramount. It also found that the lay-offs were brought about because of the concerted activities of the nine employees for their mutual aid and protection, and therefore concluded that Friedland violated § 8(a) (1). It further concluded that the natural tendency of the lockout

---

4. Some six New Jersey union painting contractors signed retroactive agreements and continued to work in the Perth Amboy and vicinity area during the strike. Some of them were members of the Garden State Painters Association. See footnote No. 1, supra.

5. Before the Board, respondent Friedland admitted that "its purpose in locking out

the members of Local 144 was * * * to contribute what it could toward preventing a victory by the union in the strike which would force it to pay benefits in excess of what it otherwise would be required to pay whenever it performed work within the territorial jurisdiction of Local 144." 158 NLRB No. 59 (1966).

was to discourage union membership in Local 144, and that Friedland therefore violated § 8(a) (3) also.

■ In the Buffalo Linen case, N.L.R.B. v. Truck Drivers Local Union No. 449, 353 U.S. 87, 93, 77 S.Ct. 643, 1 L.Ed. 2d 676 (1957), the Supreme Court accepted the proposition that a "temporary lockout may lawfully be used as a defense to a union strike tactic which threatens the destruction of the employers' interest in bargaining on a group basis." To avoid the effect of the Board's findings and conclusions here, Friedland attempts to bring itself within a group similar to the one in the Buffalo Linen case by claiming to be a member of the multi-employer unit which bargains directly with Local 144. Using its past administrative criteria as a standard, the Board could perceive of no basis for grouping the local multi-employer associations into a broader unit.[6]

We agree with the Board that there is absent here any evidence of a collective bargaining history other than that which took place strictly between a local and the area association, or that these parties have a desire that it be otherwise. No other employer, employer association or local seeking a broader unit has sought to intervene in the proceedings before the Board. Nor is there any proof that Friedland or the Elizabeth Association expressly authorized any other multi-employer unit to bargain on its behalf with any other local. Under such circumstances the Board has steadfastly refused to recognize a bargaining unit on a wider basis. Even where a group of employers desired to bargain as a unit the Board refused to recognize the unit after the union declined to bargain on that basis. See N.L.R.B. v. Great Atlantic & Pacific Tea Co., et al., 340 F.2d 690 (C.A.2, 1965). The fact that the bargaining agreement between each local and employer association with which it directly bargains has incorporated by reference the terms of the other area agreements which will apply if and when the employer performs painting work in those areas does not render the employer member of an association a member of the other associations. It long has been Board policy to rule that mere adoption by an employer of the provisions of a bargaining agreement of another is not evidence of the type which would warrant the inference that they participated in joint bargaining as a group or that the former authorized the latter to bargain for him. Pacific Metals Company Ltd., 91 NLRB 696, 700 (1950). Also see Jewish Bakery Assn., 100 NLRB 1245 (1952); West End Brewing Co., 107 NLRB 1542 (1952); Chicago Metropolitan Home Builders Assn., 119 NLRB 1184 (1957). In Line Drivers Local No. 961, etc., of Teamsters, etc., v. W. J. Digby, Inc., 218 F.Supp. 519, 522 (D.C. Colo.1963), affirmed in 341 F.2d 1016 (C.A.10), the district court held that it is "possible for an employer to agree to become bound by the contracts negotiated by a multi-employer bargaining unit without becoming part of the bargaining unit itself."

■■ The Board has wide discretion in determining an appropriate bargaining unit, and its determination in this regard will not be set aside on review unless there has been a showing that such determination was arbitrary.[7] May Dept. Stores Co. v. N.L.R.B., 326 U.S. 376, 380, 66 S.Ct. 203, 90 L.Ed. 145 (1945); N.L.R.B. v. Merner Lumber & Hardware Co., 345 F.2d 770 (C.A.9, 1965). Also see N.L.R.B. v. Schill Steel Products, Inc., 340 F.2d 568, 573–574 (C.A.5, 1965). There has been no such showing here. Moreover, assuming with-

---

6. In (Buffalo Linen) N.L.R.B. v. Truck Drivers Local Union No. 449, 353 U.S. 87 (1957), the Supreme Court observed at page 96 of its opinion, 77 S.Ct. 643 at page 647, 1 L.Ed.2d 676: " * * * Congress intended 'that the Board should continue its established administrative practice of certifying multi-employer units * * *.' "

7. One case has stated that normally, the Board's exercise of discretion in this area borders on finality. Uyeda v. Brooks, 365 F.2d 326 (C.A.6, 1966).

out so deciding, that it would make a difference, Friedland was not performing work in the Perth Amboy and vicinity area during May 3 to 5, 1965, inclusive, while the strike was still in progress. Consequently, the contract provisions of that area were not brought into play by Friedland during that period.

■ Friedland's alternative position is that the Act does not require an employer to subsidize a strike against himself, and, therefore, its locking out of the nine members of Local 144 was not an unfair labor practice because that action was pursued to further its legitimate business interest. In the case of American Ship Building Co. v. N.L.R.B., 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed. 2d 855, the Supreme Court held, "that an employer violates neither § 8(a) (1) nor § 8(a) (3) when, after a bargaining impasse has been reached, he temporarily shuts down his plant and lays off his employees for the sole purpose of bringing economic pressure to bear in support of his legitimate bargaining position." At page 311, 85 S.Ct. at page 963, of its opinion, the Court noted: "But we have consistently construed the section [§ 8(a) (3)] to leave unscathed a wide range of employer actions taken to serve legitimate business interests in some significant fashion, even though the act committed may tend to discourage union membership. See e. g., Labor Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 347 [58 S.Ct. 904, 911, 82 L.Ed. 1381]."

It is true, as Friedland points out, that while the nine members of Local 144 were working and not suffering any economic loss, they would be far more likely to favor the continuance of the strike until Local 144's demands were accepted by the Perth Amboy Association. But the Elizabeth Association was not involved in any bargaining negotiations with Local 144, the strike was not against that association or Friedland; nor were any demands being made upon them by Local 144. Clearly, Friedland had no legitimate bargaining position to protect.

Obviously, Friedland, like any other painting contractor in New Jersey, has a general interest in keeping the cost of labor from increasing in any one of the areas in that State. However, increased benefits won by another local will affect Friedland directly economically only when it performs work in the geographical jurisdiction of that local. During the labor dispute, as mentioned before, Friedland was not performing work outside the Local 1221 area. The probability of it doing so, and in the Local 144 area in particular, depends on Friedland's contracting practices with property owners in the future. In the past three years it performed work in the Perth Amboy area of which it was paid in excess of $100,000. That it will perform painting work in that area in the future is not a remote possibility. Nevertheless, the Board in balancing the interest of the nine employees against those of Friedland concluded that the employees' § 7 rights were paramount. We are not persuaded that the balance which the Board struck under the circumstances was "inadequate, irrational or arbitrary." [8] The employer members of the Elizabeth Association were aware when they signed the then prevailing bargaining agreement with Local 1221 that provisions regarding wages, hours and other conditions of employment in other areas might change before the Elizabeth area contract would expire. Moreover, Friedland knew the expiration dates of the other area agreements. Hence it could have avoided employing Local 144 members during the period in question by seeking the hiring hall services of locals other than that of Local 144.

■ Friedland claims that the Garden State Painters Association, a statewide group of over 200 union contractors of which it was a member, had a policy of refusing to hire members of locals on

8. See N.L.R.B. v. Erie Resistor Corp., 373 U.S. 221, 236, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963).

strike or of terminating their employment during a strike. The Board found no such policy existed at any time. There was substantial evidence to support this finding. But even if such a policy existed, we fail to see how it would help Friedland. It has stipulated that this Association did not bargain with any labor organization.

 An organization known as the Painting and Decorating Contractors of America, Inc., has, as *amicus curiae*, submitted, for our perusal, excerpts from its bylaws. The document is being offered as evidence of the economic interest all members of that Association have in each area where they have contracts or jobs. It can have no effect on our decision. The document had not been offered at the hearing before the Trial Examiner, Harry H. Kuskin, who presided at the hearing of the charges in this proceeding. It is the function of the Board, and not this court, to find the facts.

Finally, Friedland maintains that since there is an absence of proof of anti-union animus on its part, there can be no finding of a § 8(a) (3) violation. "Under that section both discrimination and a resulting discouragement of union membership are necessary, but the added element of unlawful intent is also required." N.L.R.B. v. Brown, 380 U.S. 278, 286, 85 S.Ct. 980, 985, 13 L.Ed.2d 839 (1965). There is no question that Friedland's action in locking out the nine Local 144 member employees was discriminatory in regard to tenure of employment of those employees and that its intended purpose was to bring about a settlement of a labor dispute on terms as favorable as possible to the Perth Amboy Association. The natural tendency of such action was to discourage in some degree membership in Local 144. As slight as that tendency may have been, it looms large when compared with the economic justification for Friedland's actions. The latter had no significant employer interest to protect or advance. Under those circumstances, "no specific evidence of intent to discourage union membership or other antiunion animus is required." American Ship Building Co. v. N.L.R.B., supra, 380 U.S., at 311, 85 S.Ct., at 964. Also see N.L.R.B. v. Brown, supra, 380 U.S., at 287, 85 S.Ct. 980.

Accordingly, the order of the Board will be enforced.