**MOVERS AND WAREHOUSEMEN'S ASSOCIATION OF METROPOLITAN WASHINGTON, D.C., INC., et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

Local 639, International Brotherhood of Teamsters, Drivers, Chauffeurs and Helpers, Intervenor.

No. 76–1603.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 11, 1977.

Decided Feb. 23, 1977.

---

Charles P. O'Connor, Washington, D.C. (E. Carl Uehlein, Jr., Washington, D.C., Harry W. Burton, Morgan, Lewis & Bockius, Washington, D.C., on brief), for petitioners.

John D. Burgoyne, Asst. Gen. Counsel, N.L.R.B., Washington, D.C. (John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Andrew F. Tranovich, Atty., N.L.R.B., Washington, D.C., on brief), for respondent.

S. G. Lippman, Washington, D.C. (Thomas J. Hart, Lippman & Hart, Washington,

D.C., on brief), for intervenor Local Union 639, I.B.T.

Before WINTER, CRAVEN and BUTZNER, Circuit Judges.

CRAVEN, Circuit Judge:

Three questions are presented by the employers' petition for review and the Board's cross-application for enforcement of its order.

## I.

Is there substantial evidence to support the Board's finding that the employers [1] locked out their employees for the dual purposes of (1) exerting economic pressure to secure acceptance of the employers' final contract offer and (2) compelling the Union to submit the final offer to its members for ratification by a mail ballot referendum procedure?

■ We need look only at the letters written by Virgil Seward, Chairman of the MAWA Negotiating Committee, to the President of the Union dated March 27 and March 31, 1975, to conclude that there is substantial evidence to support the finding. The first letter advised that the employers would agree to retroactivity of their final offer from the time of compiling the results of membership balloting, April 7, 1975, back to April 1, 1975, if the Union would submit the employers' final offer through a referendum mail ballot pursuant to a provision of the union constitution. In the same paragraph of the letter, the employers interpreted that provision to mean that the offer could be rejected only by a two-thirds vote of the union membership. We need not decide the question, but the Union interpreted the ratification clause of its constitution differently—as requiring only a simple majority vote. In any event, union negotiators had made it perfectly clear during current negotiations that the member-

ship had been disturbed about the 1972–75 contract provision under which the ratification vote had taken place at the "barns" and had insisted all along that voting take place at the union hall. The Union therefore was not receptive to the employers' proposed ratification procedure.

The March 31 letter from Mr. Seward was even more insistent:

. . . Unless you advise us today that you will submit the employers' final offer to the membership by way of the mail ballot procedure we proposed to you on March 27, 1975, . . . the Association's membership will be forced to terminate operation by bargaining unit personnel on Tuesday, April 1, 1975.

Faithful to their chief negotiator's word, the employers locked the "barns" on April 1, and continued the lockout until April 28, 1975.

When the Union protested the lockout as an unfair labor practice, Seward hand delivered another letter, dated April 2, in which he said that the lockout was not prompted by the Union's failure to accept the mail ballot ratification demand and that the temporary termination of operations would continue only because there was no labor contract.

What has been recited is sufficient to demonstrate that there is substantial evidence to support the Board's finding that the employers had a dual objective—to bring economic pressure to bear on the Union to accept the employers' final offer with respect to wages, hours and other terms and conditions of employment, *and* to coerce the Union into accepting the employers' proposed procedure for ratification.

## II.

In an atmosphere free of antiunion animus, and with a stable bargaining relationship existing for more than 20 years, is it an unfair labor practice for an employer to

---

**1.** Movers and Warehousemen's Association of Metropolitan Washington, D.C., Inc., (MAWA) is a multi-employer bargaining association composed of ten unionized moving and storage companies in the Washington area. Although

MAWA was not formally organized until 1969, it has been the moving companies' practice for some 20 years to bargain as a group with the Union.

lock out his employees for the purpose of exerting economic pressure in support of his bargaining position *and* for the purpose of forcing the Union to follow a contract ratification procedure preferred by the employer?

We think so. For guidance we look to *NLRB v. Wooster Div. of Borg-Warner Corp.,* 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). In that case, as in this one, there was no bad faith on either side.

> But that good faith does not license the employer to refuse to enter into agreements on the ground that they do not include some proposal which is not a mandatory subject of bargaining. We agree with the Board that such conduct is, in substance, a refusal to bargain about the subjects that are within the scope of mandatory bargaining. This does not mean that bargaining is to be confined to the statutory subjects. . . . But it does not follow that, because the company may propose [nonmandatory subjects] . . . , it can lawfully insist upon them as a condition to any agreement.

*Id.* at 349, 78 S.Ct. at 723.

In *Borg-Warner* the employer insisted upon a "ballot" clause which required an opportunity for all employees in the bargaining unit to vote by secret, impartially supervised, written ballot on whether to accept or reject the Company's last offer. The Supreme Court held that such a ballot clause is not a subject within the phrase "wages, hours, and other terms and conditions of employment," 29 U.S.C. § 158(d), and was therefore not a subject of mandatory bargaining. The Court said:

> The "ballot clause is not within that definition. It relates only to the procedure to be followed by the employees among themselves before their representative may call a strike or refuse a final offer. It settles no term or condition of employment—it merely calls for an advisory vote of the employees. . . . The "ballot" clause . . . deals only with relations between the employees and their unions. It substantially modifies the collective-bargaining system provided for in the statute by weakening the independence of the "representative" chosen by the employees. It enables the employer, in effect, to deal with its employees rather than with their statutory representative.

*Id.* at 349–50, 78 S.Ct. at 723.

In *Houchens Market of Elizabethtown, Inc. v. NLRB,* 375 F.2d 208, 212 (6th Cir. 1967), the Sixth Circuit said the following about an employer's insisting upon a ratification clause:

> The Company, by insisting after all the other terms of the contract were agreed upon, that the contract be approved or ratified by a majority of the employees, was attempting to bargain, not with respect to "wages, hours and other terms and conditions of employment", but with respect to a matter which was exclusively within the internal domain of the Union. Members of a Union have the right to determine the extent of authority delegated to their bargaining unit. It is within their province to determine whether or not their bargaining unit may enter into a binding contract with or without membership ratification. It is not an issue which the Company can insist upon without mutual agreement by the Union, any more than the Union can insist that the contract be submitted to the Board of Directors or stockholders of the Company.

Similarly, in *NLRB v. Darlington Veneer Co.,* 236 F.2d 85 (4th Cir. 1956), our Chief Judge Parker had this to say in a case involving a ratification clause:

> It is well settled that an employer may not insist upon including as a condition of the contract terms having no relation to the statutory duty to bargain.

*Id.* at 89. We held in that case that an employer who insists as a condition of entering into any bargaining agreement upon a provision requiring ratification of the contract by secret vote of the employees is guilty of an unfair labor practice amounting to a refusal to bargain in violation of sections 8(a)(1), 8(a)(3) and 8(a)(5), 29 U.S.C. § 158(a)(1), (3), (5).

The only difference between *Borg-Warner, Houchens,* and *Darlington* and the present case is that the employers in those cases did not go so far in insisting upon union acceptance of a nonmandatory item. If an employer may not lawfully refuse to sign a contract unless it contains a "ballot" clause, and that is clear, certainly he may not so insist to the point of lockout—the ultimate weapon in the labor relations arsenal.

■■■ The only other question is whether the employers' desire to bring economic pressure to bear in support of their legitimate bargaining posture is sufficiently important to insulate their unlawful purpose of controlling the Union's preferred method of ratification. In other areas of labor law it is well established that an unlawful purpose is operative to invoke the sanctions of the Act even though accompanied by legitimate purposes. *E. g., Neptune Water Meter Co. v. NLRB,* 551 F.2d 568 (4th Cir. 1977). We think that to be equally true here. Thus we hold that even if a lockout is motivated in part by the wish to exert economic pressure for the lawful purpose of supporting a legitimate bargaining position, the lockout is nevertheless unlawful if also motivated by an intent to interfere with, and thus injure, a labor organization in the exercise of its own internal operating procedures. *See American Ship Building Co. v. NLRB,* 380 U.S. 300, 308, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965); *NLRB v. Bagel Bakers Council,* 434 F.2d 884, 889 (2d Cir. 1970); *NLRB v. Southern Beverage Co.,* 423 F.2d 720 (5th Cir. 1970); *NLRB v. David Friedland Painting Co.,* 377 F.2d 983, 989 (3d Cir. 1967). Here the Board properly drew an inference that the employers were determined to injure the Union by weakening the ratification power of its members. Thus we hold that the Board properly concluded that the employers here violated sections 8(a)(1), (3) and (5) of the Act by threatening to lock out, and locking out, their employees because the Union refused to submit the employers' final contract offer to the employees for ratification by way of a mail ballot referendum.

### III.

When does an unlawful lockout become lawful—if ever?

On April 2, 1975, Mr. Seward, after consultation with counsel, sent another letter to the union president. This time he backed away from insisting upon a secret mail ballot and conceded that the Union was free to use any means it deemed appropriate to ratify the employers' final offer, concluding "this is a matter solely up to the Union in handling internal affairs." The letter ended with the statement that the lockout "continues only because there is no labor contract."

■■■ The administrative law judge thought the April 2 letter cured the illegality of the lockout and stopped the running of an award of backpay as of that day. The Board disagreed, expressing the view that a lockout unlawful at its inception retains its initial taint of illegality until it is terminated and the affected employees are made whole,[2] citing prior Board decisions. We think it dispositive of the issue that the employers here failed to dissipate the effects of their unlawful lockout. There was no offer of reinstatement to the employees until the lockout ended on April 28. The employers never acknowledged their wrongdoing with regard to the lockout and never offered backpay—not even for the first two days of the lockout. Indeed, the employers have always asserted, even on appeal, that the lockout was lawful from the beginning and that the employees were not entitled to backpay. If the employers had offered reinstatement to the unlawfully locked out employees on April 2, it does not necessarily follow that the lockout would have been immediately resumed on April 3. As the Board put it:

---

**2.** We assume the Board does not mean the illegality and entitlement to backpay would run until the employees actually received their backpay checks. An admission of illegality and an offer to make whole would presumably be effective as of the time made, but we need not decide, for that question is not presented on this record.

Considering the parties' long history of peaceful labor relations, the smooth negotiations through March 25, the two months remaining until the busy season, and the Union's recognition that MAWA could, after a hiatus, lawfully lockout for economic reasons, it is not unlikely that collective bargaining free of the unfair labor practices could have resulted in an earlier contract.

■ We agree with the Board that by locking out the employees on April 1, 1975, and by continuing said lockout until April 28, 1975, the employers engaged in unfair labor practices within the meaning of sections 8(a)(1), (3) and (5) of the Act. We hold that the Board's remedy is not inappropriate and that the locked out employees are entitled to be made whole for any loss of pay they may have suffered by reason of such unlawful conduct.

*ORDER ENFORCED.*