UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 95-1266

EFRAIN RIVERA-VEGA, ET AL.,

Plaintiffs - Appellees,

v.

CONAGRA, INC., ET AL.,

Defendants - Appellants.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Dom nguez, U.S. District Judge] 



Before

Torruella, Chief Judge, 

Boudin and Stahl, Circuit Judges. 



Roger J. Miller, with whom McGrath, North, Mullin & Kratz, 
P.C., Angel Mu oz-Noya and Lespier & Mu oz-Noya were on brief for 
appellants.
Robert Tendrich, Attorney, National Labor Relations Board, 
with whom Frederick L. Feinstein, General Counsel, Mary Joyce 
Carlson, Deputy General Counsel, Barry J. Kearney, Acting 
Associate General Counsel, Ellen A. Farrell, Assistant General 
Counsel, and Corinna L. Metcalf, Deputy Assistant General 
Counsel, National Labor Relations Board, were on brief for
appellees.



November 21, 1995


TORRUELLA, Chief Judge. The respondent companies TORRUELLA, Chief Judge. 

appeal an Order of the district court granting temporary

injunctive relief to the Regional Director of the National Labor

Relations Board under 10(j) of the National Labor Relations

Act. The district court found reasonable cause to believe that

the respondents violated their duty to bargain in good faith by

refusing to provide the bargaining representative of its

employees with requested financial documents. Based

substantially on this violation, the district court issued a

preliminary injunction. Finding neither clear error nor abuse of

discretion, we affirm.

I. I.

BACKGROUND BACKGROUND 

Molinos de Puerto Rico, Inc. ("MPR") is a wholly owned

subsidiary of ConAgra, Inc. (collectively, the "respondents").1

MPR maintains three production facilities in Puerto Rico where it

mills, sells and distributes wheat, corn flour, and animal feed.

In June 1993, Congreso de Uniones Industriales de Puerto Rico

("the union") and the respondents began negotiations for a new

collective bargaining agreement, covering unit employees at MPR,

to replace an existing agreement, which was nearing expiration.

 

1 The district court found reasonable cause to believe that the
two corporate entities are "joint employers" in the context of
labor relations. As discussed infra, this finding is not clearly 
erroneous and is, accordingly, affirmed. We therefore refer to
the two companies jointly as the respondents. In addition, we
note that the district court's finding of joint employers applies
to ConAgra, Inc., and/or Conagra Grain Processing Companies, Inc.
For convenience sake only, we refer simply to "ConAgra." 

-2-

The parties soon became involved in a dispute over wages and

benefits -- respondents wanted to cut them, and the union sought

increases. On several occasions, the union requested MPR's

audited financial statements for the past five years to evaluate

respondent's bargaining position. Respondents repeatedly refused

to provide the requested information, and after four months of

bargaining and 18 bargaining sessions, declared an impasse on

October 28, 1993. On October 29, respondents informed the union

that forty employees would be laid off on November 1st. On

November 1st, respondents locked out employees reporting to work

at MPR. Respondents subsequently hired replacement workers and

continued operations.2

The union filed an unfair labor practice charge with

the National Labor Relations Board (the "NLRB"). The NLRB issued

an unfair labor practice complaint on March 25, 1994, which

charged that the respondents, as joint employers, violated 

8(a)(1), (3) and (5) of the National Labor Relations Act (the

"NLRA"), 29 U.S.C. 158(a)(1),(3), by, inter alia, failing to 

bargain in good faith when it refused to provide the union with

 

2 Respondents argued to the district court that the lockout was
implemented in lieu of the lay-off, and that the lay-off never
occurred. The district court appears to have rejected this
argument: "The problem with this theory is that at no time have
Respondents stated to the Union that the lay-off contemplated in
the implementation of their final offer has been set aside.
Thus, the number of employees in the unit remains currently at
minus forty employees." We find the record unclear on this
question. Because resolution of this issue is unnecessary for
purposes of our decision, we consider only the fact that
respondents announced the lay-offs, and not whether the lay-offs
were actually implemented.

-3-

the requested financial information, unilaterally changing the

terms and conditions of employment before impasse was reached,

unlawfully laying off 40 employees, and imposing a lockout and

replacing employees with temporary employees to compel acceptance

of its bargaining position. An administrative law judge ("ALJ")

conducted a hearing on the matter from May 9 to 13, 1994.3 On

June 10, 1994, the NLRB petitioned the district court for a

temporary injunction pursuant to section 10(j) of the NLRA, 29

U.S.C. 160(j).

After a hearing, the district court issued a

comprehensive and detailed opinion in which it found reasonable

cause to believe, inter alia, that: (1) respondents violated 

8(a)(1) and (5) by refusing to provide the requested financial

information to the union; (2) the refusal to furnish the

financial statements precluded valid impasse; (3) respondents

violated 8(a)(5) by making unilateral changes in the terms and

conditions of employment when no valid impasse existed; and (4)

respondents violated 8(a)(3) and (1) by locking out employees,

and using replacements, in furtherance of its tainted bargaining

position. The court further concluded that the standards for

issuance of a preliminary injunction were met, and that such

relief was just and proper to preserve the NLRB's ability to

provide meaningful relief in the underlying unfair labor practice

 

3 The ALJ issued a decision on June 13, 1995. The ALJ found
that respondents committed various unfair labor practices, many
of which are relevant to the issues in this appeal. We take
judicial notice of the ALJ's decision. 

-4-

action. Finally, the court found reasonable cause to believe

that MPR and ConAgra, Inc., are joint employers for the purposes

of labor relations.

The district court issued a temporary injunction,

pending a final resolution by the NLRB of the unfair labor

practice action, directing the employer, upon request, to: (1)

meet and bargain with the union; (2) restore working conditions

which existed prior to October 28, 1993, and maintain them until

the parties bargain in good faith to an agreement or an impasse

on the changes; (3) provide the union with all requested

information necessary and relevant for collective bargaining; and

(4) reinstate locked out or terminated employees. Respondents'

motion for a stay pending appeal was denied by the district court

on March 6, 1995, and subsequently by this court on March 20,

1995.

II. II.

STANDARD OF REVIEW STANDARD OF REVIEW 

Section 10(j) of the NLRA authorizes the NLRB to seek,

and the United States district courts to grant, interim relief

pending the NLRB's resolution of unfair labor practices. See 29 

U.S.C. 160(j).4 In considering a petition for interim relief
 

4 Section 10(j) provides:

The Board shall have power, upon issuance
of a complaint as provided in subsection
(b) of this section charging that any
person has engaged in or is engaging in
an unfair labor practice, to petition any
district court of the United States . . .
for appropriate temporary relief or

-5-

under 10(j), a district court must limit its inquiry to (1)

whether the NLRB has shown "reasonable cause" to believe that the

employer has committed the unfair labor practices alleged, and

(2) whether injunctive relief is "just and proper." See Pye v. 

Sullivan Bros., 38 F.3d 58, 63 (1st Cir. 1994) (collecting 

cases). In determining whether the NLRB has shown reasonable

cause, the district court does not decide whether an unfair labor

practice actually occurred; rather, its role is limited to

determining only whether the NLRB's position is "fairly supported

by the evidence." Id. (quoting Asseo v. Centro M dico del 

Turabo, 900 F.2d 445, 450 (1st Cir. 1990)). The district court 

does not resolve contested issues of fact, deferring instead to

the NLRB's version of the facts if they are "within the range of

rationality." Maram v. Universidad Interamericana de Puerto 

Rico, Inc., 722 F.2d 953, 958 (1st Cir. 1983). We review the 

district court's conclusion that reasonable cause exists only for

clear error, and examine its decision to grant equitable relief

only for abuse of discretion. Sullivan Bros., 38 F.3d at 63; 

Centro M dico del Turabo, 900 F.2d at 450. 

III. III.

DISCUSSION DISCUSSION 

A. Duty to Disclose Financial Information A. Duty to Disclose Financial Information 
 

restraining order. Upon the filing of
any such petition the court shall cause
notice thereof to be served upon such
person, and thereupon shall have
jurisdiction to grant to the Board such
temporary relief or restraining order as
it deems just and proper.

-6-

Sections 8(a)(5) and (d) of the NLRA make it an unfair

labor practice for an employer to refuse to bargain in good faith

with its employees' representative. 29 U.S.C. 158(a)(5), (d).

One element of the duty to bargain in good faith is that the

employer must, upon request, supply relevant information needed

by the union "for the proper performance of its duties as the

employees' bargaining representative." Detroit Edison Co. v. 

NLRB, 440 U.S. 301, 303 (1979); NLRB v. Acme Indus., 385 U.S. 

432, 435-36 (1967); Soule Glass and Glazing Co. v. NLRB, 652 F.2d 

1055, 1092 (1st Cir. 1981). The purpose of this rule is to

"enable the [union] to understand and intelligently discuss the

issues raised in bargaining." Soule Glass, 652 F.2d at 1092 

(quoting San Diego Newspaper Guild v. NLRB, 548 F.2d 863, 866 

(9th Cir. 1977)). Information relating to wages, hours, and

other terms and conditions of employment is presumptively

relevant and necessary for the union to perform its obligations.

Teleprompter Corp. v. NLRB, 570 F.2d 4, 8 (1st Cir. 1977); F.A. 

Bartlett Tree Expert Co., Inc., 1995 WL 238413, *2 (NLRB). 

No such presumption exists with respect to financial

data. Because of the sensitive nature of a company's financial

data, the general rule is that such information need not be

disclosed unless the bargaining representative first makes a

showing that "it is specially relevant to the bargaining taking

place." Teleprompter Corp., 570 F.2d at 8 (citing Int'l 

Woodworkers v. NLRB, 263 F.2d 483 (D.C. Cir. 1959) (Burger, J.)). 

If the employer itself puts profitability into issue by claiming

-7-

an inability to pay an increase in wages, however, then the

financial information is presumptively relevant to the bargaining

process, and the employer is required to substantiate its

economic condition. NLRB v. Truitt Mfg. Co., 351 U.S. 149, 152- 

53 (1955); Teleprompter Corp. v. NLRB, 570 F.2d 4, 7 (1st Cir. 

1977). The Supreme Court has explained the rationale for this

rule as follows:

Good faith bargaining necessarily
requires that claims made by either
bargainer should be honest claims. This
is true about an asserted inability to
pay an increase in wages. If such an
argument is important enough to present
in the give and take of bargaining, it is
important enough to require some sort of
proof of its accuracy.

Truitt Mfg., 351 U.S. at 152-53.5  

Circuit courts interpreting Truitt have long 

distinguished between cases in which an employer claims an

inability to pay the requested wage increase and those in which

the employer maintains that complying with the union's request

would place it at a competitive disadvantage, ordering disclosure

in the former but denying it in the latter. See, e.g., NLRB v. 

Harvstone Mfg. Co., 785 F.2d, 575-89 (7th Cir.), cert. denied, 

479 U.S. 821 (1986); Buffalo Concrete, 276 N.L.R.B. 839 (1985), 

enfd., 803 F.2d 1333 (4th Cir. 1986). In two recent cases, the 

 

5 The court also stressed that the right to disclosure in
inability-to-pay cases was not automatic: "Each case must turn on
its particular facts. The inquiry must always be whether or not
under the circumstances of the particular case the statutory
obligation to bargain in good faith has been met." Id. at 153-54 
(footnote omitted).

-8-

NLRB recognized, and elaborated upon the parameters of, this

dichotomy.

In Nielsen Lithographing Co., 305 N.L.R.B. 697, enfd. 

sub nom Graphic Communications Int'l Union, Local 508 v. NLRB, 

977 F.2d 1168 (7th Cir. 1992), the NLRB held that a mere claim of

competitive disadvantage does not compel an employer to open its

financial records to a union. The NLRB explained:

The employer who claims a present
inability to pay, or a prospective
inability to pay during the life of a
contract being negotiated is claiming
essentially that it cannot pay. By
contrast, the employer who claims only
economic difficulties or business losses
or the prospect of layoffs is simply
saying that it does not want to pay.

We do not say that claims of economic
hardship or business losses or the
prospect of layoffs can never amount to a
claim of inability to pay. Depending on
the facts and circumstances of a
particular case, the evidence may
establish that the employer is asserting
that the economic problems have led to an
inability to pay or will do so during the
life of the contract being negotiated
. . . . The distinction has always been
between claims of 'cannot' and will not."

Nielsen, 305 N.L.R.B. at 701. Thus, under Nielsen, an employer 

must disclose financial information to the union if the employer

has asserted that it "cannot pay" wage increases, but need not do

so if it has asserted only that it "will not pay" wage increases.

In The Shell Company, 313 N.L.R.B. 133 (1993), 1993 WL 

491815, the NLRB made explicit what was implicit in Nielsen -- 

namely, that the critical inquiry in the "cannot pay"/"will not

-9-

pay" distinction is the substance of the employer's bargaining 

position, not the formal words used by the employer.

In Shell, the employer consistently stated that "it was 

not pleading poverty or inability to pay in the negotiations, but

was simply adopting a firm position in order to become more

competitive in the short run and in the future." Id. at *6. The 

NLRB nevertheless concluded:

Although the [company] referred to
economic disadvantages it had in relation
to other competitors, . . . the testimony
reveals that the essential core of the
[company's] bargaining posture as a
whole, as expressed to the Union, was
grounded in assertions amounting to a
claim that it could not economically
afford the most recent contract at its
Airport operation, that it was faced with
a present threat to that operations
survival, and that, therefore, it was at
present unable to pay those terms in the
successor contract.

Id. at *1. See also New York Printing Pressmen and Offset 

Workers Union No. 51 v. NLRB, 538 F.2d 496, 500 (2d Cir. 1976) 

("So long as the Employer's refusal reasonably interpreted is the

result of financial inability to meet the employees' demand

rather than simple unwillingness to do so, the exact formulation

used by the Employer in conveying this message is immaterial."). 

The facts upon which the NLRB relied in Shell were that 

the employer's bargaining representative told the union

negotiator during negotiations for the new collective bargaining

agreement that (1) economic conditions had affected the company

"very badly, very seriously"; (2) present circumstances at the

company's Airport were "bad," "critical" and a matter of

-10-

"survival"; and (3) the company was losing business, had lost an

important customer, and was facing serious regulatory and cost

problems. He also said: "we are telling you this because we need

your help, your assistance, because of this condition." In

addition, the NLRB found it significant that the employer

expressly referred to steps it had already taken to address the

threats to its survival; namely, that it had put a hiring freeze

on all management and employee positions, and implemented an

early retirement plan. Id. 

Based on these statements, the ALJ concluded:

The Company's situation at the Airport
was continually described as "critical"
and a matter of "survival." Critical
certainly denotes a degree of urgency or
crisis, and when used with survival,
denotes a situation in medical terms that
would indicate the patient is in imminent
danger of dying, or in the case of the
Airport operation, closing down. I do
not think a reasonable person could hear
Respondent's representatives describe the
airport situation as critical and one of
survival, and believe that they were
speaking of some event that might occur
at some point three years or more in the
future.

Id. at *31. 

The district court found the instant action similar to

Shell. The court concluded that "[w]hile Respondents 

continuously reiterated that they needed to remain competitive

and denied claiming inability to pay, the 'essential core' of its

bargaining posture was in effect that it could not afford the

terms of the successor contract." The district court based this

conclusion upon the substance of the message communicated by

-11-

respondents to the union over the course of the four month

bargaining period. In particular, the district court noted the

following allegations by the NLRB. 

During the first bargaining session, the negotiator for

respondents spoke of the difficult situation facing the company

and stated "if we don't take immediate measures there is a

probability that we won't be here in the future." Respondents'

negotiator also suggested that ConAgra, Inc., was considering

closing the mill in Puerto Rico and bringing in flour directly

from the United States. In addition, respondents' negotiators

made the following statements during the course of bargaining:

(1) "The situation is a serious one and fragile."; (2) "If we are

not competitive we cannot survive."; (3) "Things like this [the

need to eliminate the granting of a soap bar to employees] are

what makes us not competitive vis- -vis the other and could make

us have to close shop because we cannot compete."; and (4) "We

see the situation as quite risky because of our ability to be

competitive." The court also found it significant that, during

negotiations, respondents told the union that it was necessary to

significantly reduce the number of employees, and then, a day

after it declared impasse, told the union that it had decided to

lay-off forty employees (almost 30% of the unit) because of its

economic position. 

Based on the foregoing, the district court determined

that the NLRB had shown reasonable cause to believe that the

employer had committed an unfair labor practice by not disclosing

-12-

the requested financial information. As noted previously, the

district court's role in this matter was not to determine whether

an unfair labor practice actually occurred, but to determine

whether the NLRB's position is "fairly supported by the

evidence." Sullivan Bros., 38 F.3d at 63 (quoting Centro M dico, 

900 F.2d at 450). On this record, we cannot conclude that the

district court's conclusion was clearly erroneous.

Moreover, we think our conclusion, reached after

independently reviewing the record, is confirmed by the fact that

the ALJ, who held a hearing and took evidence on the NLRB's

allegations, concluded that the respondents violated 8(a)(5)

and (1) by refusing to provide the union with the requested

financial information. Specifically, the ALJ found that the

facts of the instant case "fall closer to Shell than Nielsen, 

thereby bringing it 'within the gravitational field of Truitt.'" 

Respondents' most compelling argument on appeal is

that, during the bargaining process, their negotiators

consistently used the phrase "long term" when discussing MPR's

prospects for survival. The difficulty with this argument is

that the proposed agreement under negotiations was for a period

of five years. While it might be argued that the phrase "long

term" implies a time more than five years hence, it can just as

persuasively be argued that to most workers -- as opposed to, for

example, a corporate executive in charge of strategic planning --

"long term" suggests next year, the year after, etc. The

question under Neilsen and Shell is whether the "essential core" 

-13-

of the employer's bargaining position amounts to a claim of a

present inability to pay, or of a prospective inability to pay 

during the life of a contract being negotiated. Neilsen, 305 

N.L.R.B. at 701; Shell, 1993 WL 491815, at *1-2. We cannot say 

that the district court's conclusion in this regard is clearly

erroneous. See Shell, 1993 WL 491815, *31 ("I do not think a 

reasonable person could hear Respondent's representatives

describe the airport situation as critical and one of survival,

and believe that they were speaking of some event that might

occur at some point three years or more in the future.").6

B. Impasse B. Impasse 

An employer violates 8(a)(1) and (5) of the NLRA by 

unilaterally changing a condition of employment that is the

subject of negotiations, or refusing to negotiate on a mandatory

bargaining topic. NLRB v. Katz, 369 U.S. 736, 743 (1962). "The 

principle exception to this rule occurs when the negotiations

reach an impasse: when impasse occurs, the employer is free to

 

6 Pursuant to the district court order, the parties have agreed
to a confidentiality agreement with respect to the financial
information. This agreement moots many of respondents' arguments
with respect to the financial information. Moreover, we reject
respondents' contention that it was excused from disclosing the
information during negotiations because the union resisted a
confidentiality agreement. The record as a whole indicates that
respondents' willingness to disclose the information, subject to
a confidentiality agreement, was tied to its insistence that the
union first demonstrate the relevancy of the documents, and its
rejection of the union's assertion that the information was
relevant to substantiate respondents' assertion that it was
unable to pay the increased wages. Thus, even if the union had
agreed to a confidentiality agreement, respondents' would not
have disclosed the information because it rejected the union's
relevancy showing. 

-14-

implement changes in employment terms unilaterally so long as the

changes have been previously offered to the union during

bargaining." Bolton-Emerson, Inc. v. NLRB, 899 F.2d 104, 108 

(1st Cir. 1990) (quoting Huck Mfg. v. NLRB, 693 F.2d 1176, 1186 

(5th Cir. 1982)). An impasse exists when, after good faith

bargaining, "the parties are deadlocked so that any further

bargaining would be futile." Id. (citing Gulf States Mfg., Inc. 

v. NLRB, 704 F.2d 1390, 1398 (5th Cir. 1983)).  

We have upheld, as not clearly erroneous, the district

court's finding of reasonable cause to believe that respondents

had a duty to disclose the requested financial information, and

that their failure to do so constituted a failure to bargain in

good faith with the union in violation of 8(a)(5) of the NLRA.

See Truitt, 351 U.S. at 152-53 (employer's refusal to produce 

financial records to substantiate claim of inability to pay

increased wages may support finding of failure to bargain in good

faith); Teleprompter, 570 F.2d at 8 n.2 (noting that Truitt has 

become "widely accepted" as establishing an "automatic" rule of

disclosure in inability to pay cases). See also Katz, 369 U.S. 

at 747 (rejecting contention that a finding of subjective bad

faith is a prerequisite to a conlusion that employer violated 

8(a)(5)). The district court found reasonable cause to believe

that respondents' failure to bargain in good faith precluded

valid impasse from occurring. Cf. New York Printing, 538 F.2d at 

501 (there can be no genuine impasse where employer has failed to

bargain in good faith by refusing to disclose properly requested

-15-

financial information); NLRB v. Palomar Corp., 465 F.2d 731, 735 

(5th Cir. 1972) (no valid impasse because, "in refusing to

disclose their financial records to the Union, [respondents]

failed to bargain in good faith as required by" the NLRA). Based

on the foregoing considerations, we conclude that this finding is

not clearly erroneous.

C. The Unilateral Changes in Conditions C. The Unilateral Changes in Conditions 
of Employment and the Lockout of Employment and the Lockout 

An employer violates its bargaining obligation under

8(a)(1) and (5) if, without having negotiated to impasse, it

unilaterally changes its employees' terms or conditions of

employment. Katz, 369 U.S. at 743. The district court in this 

case found reasonable cause to believe that respondents'

implemented the following unilateral changes: alteration of the

form of employee payment from cash to check; refusal to provide

employees with contractual Thanksgiving turkey, and the payment

of accrued vacation time; termination of medical plan coverage

for locked out employees; and a lay-off of forty employees. With

exception of the last question, see infra n.2, each of these 

findings is "fairly supported by the evidence," see Centro M dico 

del Turabo, 900 F.2d at 450, and therefore not clearly erroneous. 

Because we uphold the district court's finding of reasonable

cause to believe that impasse did not exist, we also uphold its

finding of reasonable cause to believe that respondents'

unilateral changes to the terms and conditions of employment

violated 8(a)(5).

-16-

There is no dispute that respondents locked-out their

employees and hired replacement workers. The district court

found reasonable cause to believe that the purpose of the lockout

was to compel acceptance of respondents' tainted bargaining

position (i.e., its failure to disclose the properly requested

financial information), and therefore found reasonable cause to

believe that the lockout, and use of replacements, constituted an

unfair labor practice.

The district court properly recognized that a lockout

motivated by an employer's desire to bring economic pressure to

bear in support of its legitimate bargaining posture is lawful.

See American Shipbuilding Co. v. NLRB, 380 U.S. 300, 312-13 

(1965). The district court also recognized, however, that a

lockout with a proscribed purpose is illegal. See id. at 313 (to 

find that lockout violates 8(a)(3) NLRB must find that the

employer acted for a "proscribed purpose").

The disagreement that led to the lockout concerned

wages. We have upheld the district court's finding of reasonable

cause to believe that the sticking point was respondents'

insistence that it could not pay increased wages, and its illegal

refusal to substantiate this claim. Thus, the district court

found reasonable cause to believe that the lockout in this case

was motivated by respondents' desire to compel acceptance of

their illegally tainted bargaining position. There is no

question that a lockout under such circumstances violates 

8(a)(3) of the NLRA. See, e.g., American Cyanamid Co. v. NLRB, 

-17-

592 F.2d 356, 364 (7th Cir. 1979); Movers & Wrhsemen's Ass'n v. 

NLRB, 550 F.2d 962, 966 (4th Cir. 1977); NLRB v. Bagel Bakers 

Council, 434 F.2d 884, 888-89 (2d Cir.), cert. denied, 402 U.S. 

908 (1970); NLRB v. Southern Beverage Co., 423 F.2d 720 (5th Cir. 

1970). We therefore conclude that the district court's finding

of reasonable cause with respect to the lockout was not clearly

erroneous.

D. Joint Employers D. Joint Employers 

The district court found reasonable cause to believe

that MPR and ConAgra, Inc., are joint employers. "A joint

employer relationship exists where two or more employers exert

significant control over the same employees and share or co-

determine those matters governing essential terms and conditions

of employment." Holyoke Visiting Nurses Ass'n v. NLRB, 11 F.3d 

302, 306 (1st Cir. 1993) (citing Rivas v. Federaci n de 

Asociaciones Pecuarias de Puerto Rico, 929 F.3d 814, 819-20 (1st 

Cir. 1991)). See also Boire v. Greyhound Corp., 376 U.S. 473, 

481 (1964); NLRB v. Browning-Ferris Indus., Inc., 691 F.2d 1117, 

1124 (3d Cir. 1982). 

In Holyoke Nurses and Rivas, this court favorably 

acknowledged a host of factors used by other courts in

determining the existence of joint employer status. See Holyoke 

Nurses, 11 F.3d at 306; Rivas, 929 F.2d at 820-21. Those factors 

include: supervision of the employees' day-to-day activities;

authority to hire, fire, or discipline employees; authority to

promulgate work rules, conditions of employment, and work

-18-

assignments; participation in the collective bargaining process;

ultimate power over changes in employer compensation, benefits

and overtime; and authority over the number of employees. See 

W.W. Granger, Inc. v. NLRB, 860 F.2d 244, 247 (7th Cir. 1988); 

Clinton's Ditch Cooperative Co. v. NLRB, 778 F.2d 132, 138-39 (2d 

Cir. 1985), cert. denied, 479 U.S. 814 (1986); Ref-Chem Co. v. 

NLRB, 418 F.2d 127, 129 (5th Cir. 1969). 

Whether joint employer status exists is essentially a

factual question. Holyoke Nurses, 11 F.3d at 306. As noted 

previously, in the context of a 10(j) petition for interim

relief, the district court does not resolve contested issues of

fact, but instead defers to the NLRB's version of the facts if

they are "within the range of rationality." Maram, 722 F.2d at 

958. 

In this case, the district court found that MPR is a

wholly owned subsidiary of ConAgra, uses its logo, holds itself

out to the public as a ConAgra enterprise, and has some directors

who also hold positions at ConAgra. The court also found that

the impetus for respondents' decision to seek wage and benefit

cuts in the new bargaining session was a change in the

organizational structure of ConAgra, pursuant to which MPR would

be part of more than sixty companies known as ConAgra Grain

Processing Company, and subsequently be compared to them.

Significantly, the court found that ConAgra's Vice-

President of Human Resources, Raymond Godbout ("Godbout") was

responsible for the negotiation strategy utilized during the

-19-

bargaining sessions, and acted throughout as an advisor to MPR's

negotiator. Moreover, the court found that Godbout actively

participated in the bargaining sessions, and on one occasion

stated to the union representative: "what I would like to do is

go back to my people and talk with the persons at the corporate

level . . . . See if we can sharpen the pencil and present to

you what our position is." In addition, the court found that the

drug policy proposed during negotiations was the same policy used

by ConAgra at its other plants, and that MPR's employees have the

same pension plan as that of ConAgra employees. The court

further found that, after the lockout, Godbout became the "de

facto spokesperson" for the respondents, and that henceforth

ConAgra was determining labor policies for MPR through Godbout.

The court also found that, after the lockout, replacement workers

were provided and paid by ConAgra.

Based on these factors, the court found reasonable

cause to believe MPR and ConAgra are joint employers for purposes

of the pertinent collective bargaining negotiations. The court's

factual findings are "fairly supported by the evidence," see 

Sullivan Bros., 38 F.3d at 63, and its finding of reasonable 

cause is not clearly erroneous.

E. The Preliminary Injunction E. The Preliminary Injunction 

The district court properly recognized and applied the

test for determining whether interim relief is "just and proper"

under 10(j). The determination of whether injunctive relief is

just and proper hinges upon whether the NLRB has demonstrated:

-20-

(1) a likelihood of success on the merits; (2) the potential for

irreparable injury in the absence of relief; (3) that such injury

outweighs any harm preliminary injunctive relief would inflict on

the employer; and (4) that preliminary relief is in the public

interest. Sullivan Bros., 38 F.3d at 58 (collecting cases). 

When, as in this case, the interim relief sought by the NLRB "is

essentially the final relief sought, the likelihood of success

should be strong." Id. (quoting Asseo v. Pan American Grain Co., 

805 F.2d 23, 25 (1st Cir. 1986)).

It is well settled that "we scrutinize a district

court's decision to grant or deny a preliminary injunction under

a relatively deferential glass." Feinstein v. Space Ventures, 

Inc., 989 F.2d 49, 51 (1st Cir. 1993) (quoting Independent Oil & 

Chem. Workers of Quincy, Inc. v. Proctor & Gamble Mfg. Co., 864 

F.2d 927, 929 (1st Cir. 1988)). Unless the district court has

made a mistake of law or abused its discretion, we will not

disturb its decision. See Sullivan Bros., 38 F.3d at 63-64; 

Feinstein, 989 F.2d at 51.  

With these principles in mind, we review the district court's

decision that interim relief under 10(j) was just and proper.

The district court plainly did not abuse its discretion

in finding a strong likelihood that the NLRB will succeed on the

merits of its unfair labor practice claims. The court

meticulously and comprehensively applied the appropriate legal

standards to the NLRB's allegations. Respondents challenge to

the district court's finding in this regard is limited to a

-21-

rehash of their arguments that the court clearly erred in finding

reasonable cause on each of the alleged unfair labor practices.

Contrary to respondents' arguments, the district court's findings

are amply supported by both the record and pertinent case law.

The district court found the potential for irreparable

injury in the absence of interim relief because of the potential

effect of the large scale employee lockout on union support and

the union's ability to bargain effectively on behalf of its

employees. The court specifically found that the lockout had

already caused an erosion in union support. Erosion of union

support cannot be remedied by the NLRB's ultimate order. See 

Centro M dico, 900 F.2d at 454; Asseo v. Pan American Grain Co., 

805 F.2d 23, 26-27 (1st Cir. 1986). Moreover, we agree with the

district court that the fact that the lockout in this case was

directed to "the entire work force" increases the chances of

irreparable harm. See Maram, 722 F.2d at 959. In this regard, 

the court specifically found that respondents' conduct had

already caused many employees to be in arrears on their loans,

which consequently damaged their credit. We find no abuse of

discretion in the court's finding of a potential for irreparable

harm.

Nor do we find abuse of discretion in the court's

determination that the very real danger that the union would lose

support because of unfair labor practices committed by the

employer, combined with the actual financial harm to the

employees, outweighs any harm which granting preliminary

-22-

injunctive relief may cause the employer. Cf. Centro M dico, 900 

F.2d at 454. Respondents argue that, if they are required to end

the lockout and reinstate employees at their former wage and

benefit levels, their "market share could well deteriorate

further." Respondents stress that this would be particularly

harmful if the NLRB later rules in their favor. The first answer

to this argument is that we have already upheld the district

court's determination that there is a strong likelihood that the

NLRB will not rule in respondents' favor. This finding, of

course, informs our balancing of the harms, and points in the

direction opposite to that urged by respondents. Second,

respondents' unsupported assertions regarding loss of market

share amount to nothing more than bald speculation. Finally, our

resolution of the first three factors leads to the conclusion

that the district court did not abuse its discretion in finding

that the public interest will be furthered by imposition of the

interim injunctive relief. Given the high number of employees

effected by the lockout, cf. Maram, 722 F.2d at 960, and the 

potential that interim relief will have the salutary effect of

strengthening the bargaining process, see Centro M dico, 900 F.2d 

at 455, the public interest in preliminary relief appears strong.

Contrary to respondents' assertions, we do not find that the

length of time between the filing of charges by the union and the

NLRB's application for interim was, under the circumstances, so

unreasonable as to significantly undercut the public interest in

preliminary relief.

-23-

IV. IV.

CONCLUSION CONCLUSION 

Interim injunctive relief under 10(j) is appropriate

to restore the status quo "when the circumstances of a case

create a reasonable apprehension that the efficacy of the Board's 

final order may be nullified, or the administrative procedures

will be rendered meaningless." Centro M dico, 900 F.2d at 455 

(quoting Angle v. Sacks, 382 F.2d 655, 660 (10th Cir. 1967)). 

The district court did not clearly err in finding reasonable

cause to support the Regional Director's position that

respondents' committed unfair labor practices. Nor did the

district court abuse its discretion in concluding that interim

injunctive relief was just and proper. The order of the district

court is therefore affirmed. Costs to appellee. affirmed. 

-24-